**UNITED STATES of America**

v.

**Luis Arturo RUBIO–HERNANDEZ.**

**United States of America**

v.

**Rigoberto Hernandez–Vizcaino.**

**Nos. P–97–CR–211–F, P–98–CR–171–F.**

United States District Court,
W.D. Texas,
Pecos Division.

March 2, 1999.

safeguarding persons against searches and seizures proscribed by the Fourth Amendment.

*Almeida–Sanchez v. United States,* 413 U.S. 266, 275, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (Powell.J., concurring). Justice Powell also acknowledged that, while the "magnitude of the problem is clear," an "answer, reconciling the obvious needs of law enforcement with relevant constitutional rights, is far less clear." *Id.* at 277, 93 S.Ct. 2535. Although many judges have written many opinions on the subject since Justice Powell penned these words in 1973, an answer remains elusive. The two cases now before this Court illustrate the point.

In each case, Defendants filed motions to suppress under the Fourth Amendment, asserting that the Border Patrol agents who stopped them did not have reasonable suspicion to believe that the Defendants were engaged in criminal activity. The motions were initially referred to United States Magistrate Judge L. Stuart Platt, who held evidentiary hearings and then recommended that the motion to suppress filed by Luis Arturo Rubio–Hernandez (*"Rubio"*) should be granted and that the motion filed by Rigoberto Hernandez–Vizcaino (*"Hernandez"*) should be denied. In this Order, the Court will not only rule on Judge Platt's well-researched and well-written recommendations, but will also invite the Fifth Circuit to revisit its present jurisprudence regarding Fourth Amendment law involving roving patrol stops in the border region.

Fred C. Brigman, Assistant U.S. Attorney, Alpine, TX, for United States.

Kurt J. Mayer, Assistant Federal Public Defender, El Paso, TX, for defendants.

## MEMORANDUM OPINION AND ORDER

FURGESON, District Judge.

How do we balance our Fourth Amendment rights, which "belong in the catalog of indispensable freedoms," *Brinegar v. United States,* 338 U.S. 160, 180, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting) with our legitimate need to prevent alien and drug smuggling across our borders? As Justice Powell observed:

> There can be no question as to the seriousness and legitimacy of the law enforcement problem with respect to enforcing along thousands of miles of open border valid immigration and related laws. Nor can there be any question as to the necessity, in our free society, of

## I. Roving Patrol Stops on the Border

In *United States v. Brignoni–Ponce,* the Supreme Court first articulated how the roving patrols of the U.S. Border Patrol could constitutionally make stops of vehicles traveling near the border. *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Utilizing the reasoning enunciated in *Terry v. Ohio,* the Supreme Court stated "that in appropriate circumstances the Fourth

Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime." *Brignoni–Ponce,* 422 U.S. at 881, 95 S.Ct. 2574 (analyzing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Likewise, in roving patrol cases at the border,

> because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion.

*Id.*

In *Brignoni–Ponce,* the Supreme Court further held that, except "at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. 2574. This test was extended to include criminal activity as well as alien smuggling in *United States v. Cortez,* which held that "the question is whether, based upon the whole picture, they, as experienced Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity." *United States v. Cortez,* 449 U.S. 411, 421–22, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In *Cortez,* the Supreme Court emphasized how the test was to be administered:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. *But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account.* Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*Id.* at 417–18, 101 S.Ct. 690 (emphasis added).

The Federal Judicial Circuits, especially along the United States–Mexico border, have been left to fill in the details of the roving patrol jurisprudence enunciated by the Supreme Court. Certainly the Fifth Circuit has shouldered its fair share of the load. As these two cases before the Court will show, the difficulty is in the details.

## II. The Fifth Circuit's "Vital Element" and "Fifty Mile" Rules

In the Fifth Circuit, the *Brignoni–Ponce* factors are evaluated for reasonableness in light of two additional rules: (1) a "vital element" of the *Brignoni–Ponce* test is whether the agents making the stop have reason to believe that the vehicles came from the border, *see United States v. Pallares–Pallares,* 784 F.2d 1231, 1233 (5th Cir.1986), and (2) when the stop occurs a substantial distance from the border, defined as over fifty miles, this "vital element" is missing. *See United States v. Inocencio,* 40 F.3d 716, 722 & nn. 6–7 (5th Cir.1994). If there is no reason to believe that the vehicle has come from the border, i.e., if the "vital element" rule has not been met, all other factors must be examined "charily." *See United States v. Pena–Cantu,* 639 F.2d 1228, 1229 (5th Cir.1981); *Pallares–Pallares,* 784 F.2d at 1233. Accordingly, the emphasis under these rules is whether the vehicle originated at the border.

But why is this so? Certainly nowhere in *Brignoni–Ponce* or *Cortez* does the Supreme Court suggest in any way that border origination is a "vital element" in the

inquiry. Nonetheless, by focusing on border origination, the Fifth Circuit appears to have made the "vital element" and "fifty mile" factors more equal than any others in the examination of reasonable suspicion in the roving patrol context. One purpose of this Order is to discuss the problems caused by this "more equal" treatment.

### A. The History of the "Vital Element" Rule

Tracing the "vital element" language back to the beginning leads one to *United States v. Woodard,* where the Fifth Circuit wrote:

> As the Court has pointed out in prior cases, a vital element of the test is whether the agent had 'reason to believe that the vehicle had come from the border,' *Martinez, supra* at 1648; *accord, Del Bosque, supra* at 1252.

*United States v. Woodard,* 531 F.2d 741, 743 (5th Cir.1976). There are some problems with this formulation. First, neither the *Martinez* nor *Del Bosque* opinions employed the words "vital element." *See United States v. Martinez,* 526 F.2d 954 (5th Cir.1976); *United States v. Del Bosque,* 523 F.2d 1251 (5th Cir.1975) (per curiam). Nor did these decisions seem to elevate the "vital element" factor in any way. Both decisions addressed the factor of reasonable suspicion in the context of whether the vehicle came from the border, but this factor was not described as a "vital" one. *See Martinez,* 526 F.2d at 955; *Del Bosque,* 523 F.2d at 1252.

The *Martinez* court dealt with a suspect stopped fifty miles north of the border on a road that originated thirty miles north of the border. *See Martinez,* 526 F.2d at 955. The only thing the Fifth Circuit noted regarding border origination was that "[the Border Patrol] had no reason to believe that the vehicle had come from the border, or that Peralez was violating any law." *Id.* The *Del Bosque* court, in a terse opinion, dealt with a suspect stopped sixty miles north of the border after his car set off a "Chekar Device." *See Del Bosque,* 523 F.2d at 1251. Apparently, the agent testified that the sole reason for the stop was to conduct a citizenship check:

> The officer's sole reason for stopping appellant's car was to check his citizenship. The officer had no prior indication that appellant had crossed the border. The single factor that the occupants of a car appear to be of Mexican ancestry does not furnish reasonable grounds to stop the car.

*Id.* at 1252. In neither *Martinez* nor *Del Bosque* did the Fifth Circuit hint that, if the Border Patrol agents had known the vehicle had originated at the border, the results would have been different.

On this language, and no more, the *Woodard* court elevated the "vital element" factor to preeminence. *See Woodard,* 531 F.2d at 743. The next decision after *Woodard* took the dicta a step further. In *United States v. Escamilla,* the court stated "[o]n three separate occasions, this Court has stressed that a 'vital' element of the *Brignoni–Ponce* test is whether the agents had 'reason to believe that the vehicle (in question) had come from the border.'" *United States v. Escamilla,* 560 F.2d 1229, 1231–32 (5th Cir.1977) (citing *Woodard, Martinez* and *Del Bosque, supra*). The statement is, quite simply, not correct. Nevertheless, *Escamilla* cemented the "vital element" language into the analytical framework of the Fifth Circuit's jurisprudence on roving patrols for future Circuit panels to deal with as best they could.

As a practical matter, one central problem has plagued this formulation from the beginning: the "vital element" rule collides with the reality that seldom, if ever, does the Border Patrol have reason to believe that suspected vehicles traveling on roads in proximity to the border actually originated their trip at the border. What does it then mean that a "vital element" is missing in almost every roving patrol case? Must every stop be invalidated? Can this be squared with the balanced "totality of the

circumstances" approach envisioned by the Supreme Court in *Brignoni–Ponce?*

## B. The History of the "Fifty Mile" Rule

With the "vital element" rule in place as precedent, the question focused on how to make it work. The answer came from Judge Reynaldo Garza, who wrote a series of opinions which certainly alleviated, but did not eliminate, the central problem presented by the rule. Elimination would require abrogation of the rule. Since one judge writing for one panel cannot abrogate precedent, Judge Garza did the next best thing: he created the "fifty mile" rule to bring the roving patrol analysis in the Fifth Circuit back into some balance.

Although he took the first step in *United States v. Cardona,* Judge Garza did not articulate the rule there. *United States v. Cardona,* 955 F.2d 976 (5th Cir.1992). Instead, he set the stage for it. Two years later, in footnotes no less, he announced the rule in the *Inocencio* decision:

FN6. This Court considers the fact that a vehicle may have recently crossed the border as a vital element in making an investigatory stop. *United States v. Melendez–Gonzalez,* 727 F.2d 407–11 (5th Cir.1984). This stems from the fact that we are reluctant to allow governmental interference with people traveling within our country, even if the vehicle is traveling close to the border. *Id.* That situation, however, is completely different from the instance where someone has "definitely and positively entered this country from abroad." *Id.* (quoting *United States v. Lopez,* 564 F.2d 710, 712 (5th Cir.1977)). In the latter case, a stop at the border or its "functional equivalent" is automatically justified without a showing of probable cause or even reasonable suspicion. *Id.* (citing *Almeida–Sanchez v. United States,* 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539–40, 37 L.Ed.2d 596 (1973)). At times, this issue is resolved by an analysis of the road the vehicle was travelling (sic) on, the number of towns along the road, the number of intersecting roads and, finally, the number of miles the vehicle was actually from the border at the point of the stop. *United States v. Cardona,* 955 F.2d 976, 980 (5th Cir.), cert. denied, 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 291 (1992).

FN7. Vehicles traveling more than fifty miles from the border are usually a "substantial" distance from the border. *See Cardona,* 955 F.2d 976, 980 (5th Cir.), cert. denied, 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 291 (1992) (stop was proper where vehicle was between 40 and 50 miles from Mexican border); *United States v. Melendez–Gonzalez,* 727 F.2d 407–11 (5th Cir.1984) (a stop sixty miles from the Mexican border was not sufficient to establish that vehicle originated from the border).

*Inocencio,* 40 F.3d at 722–23 nn. 6–7. While neither the *Cardona* decision nor the *Melendez–Gonzalez* decision, referenced in footnote seven, certified the "fifty mile" benchmark, they provided a convenient floor and ceiling to calculate an average. *See generally Cardona,* 955 F.2d at 980; *Melendez–Gonzalez,* 727 F.2d at 411.

How did the "fifty mile" rule then alleviate the problem with the "vital element" rule? The "fifty mile" rule created a presumption that all vehicles stopped fifty or more miles from the border did not originate at the border. *See United States v. Rodriguez–Rivas,* 151 F.3d 377, 380 (5th Cir.1998); *United States v. Jones,* 149 F.3d 364, 368 (5th Cir.1998) (stating no "bright line" exists); *Inocencio,* 40 F.3d at 722 n. 7. If the vehicle did not originate at the border, a "vital element" is missing. *See United States v. Moreno–Chaparro,* 157 F.3d 298, 300 (5th Cir.1998); *Inocencio,* 40 F.3d at 722 & nn. 6–7. If this "vital element" is missing, all other factors in determining reasonable suspicion must be viewed charily. *See United States v. Aldaco,* 168 F.3d 148, 150–51 (5th Cir.1999) (examining remaining factors "carefully"): *Rodriguez–Rivas,* 151 F.3d at 380 (examining remaining factors "most carefully");

*Inocencio,* 40 F.3d at 723 (examining remaining factors "charily"). Therefore, the "fifty mile" rule creates a presumption that causes all factors to be viewed charily when a vehicle is first observed fifty or more miles from the border.

Although the "fifty mile" rule creates a presumption against the existence of this "vital element" for vehicles observed over fifty miles from the border, the Fifth Circuit has never directly held that the reverse presumption is true. That is, there is no clearly stated presumption that a vehicle first observed within fifty miles of the border originated its journey at the border. One could, however, easily infer that the reverse presumption is true, and this Court chooses to do so.

Judge Garza next addressed the "fifty mile" rule in *United States v. Nichols.* *United States v. Nichols,* 142 F.3d 857 (5th Cir.1998). The opinion is particularly interesting because it equated the "vital element" concept of border origination with the *Brignoni–Ponce* enumerated factor of border proximity:

> In light of *Cardona,* and common sense, the Border Patrol agents in this case clearly had reason to believe that Nichols was coming from the border. Nichols was only about 30 miles from the border, while *Cardona,* and other cases have considered proximity to the border to be a factor contributing to reasonable suspicion when the stop occurred up to 50 miles from the border.

*Id.* at 866–67. Of course, border origination and border proximity are not the same thing and, despite Judge Garza's skillful effort to join the concepts in *Nichols,* the other judges of the Fifth Circuit have not generally treated the concepts as the same in their other opinions. The emphasis has always been on border origination, not border proximity, *C.f., Moreno–Chaparro,* 157 F.3d at 300 ("Agent Hollenbeck did not have reasonable grounds to believe that Moreno had *crossed* the border.") (emphasis added); *Rodriguez–Ri-*

*vas,* 151 F.3d at 380 ("A stop 60 miles from the Mexican border, we have found, was not near enough to the border to justify a belief that the vehicle *originated* from the border.") (emphasis added). Regardless, however. Judge Garza's approach has been helpful; still, analytical constraints remain, even under his improved approach.

An example is *United States v. Jones,* where the Fifth Circuit said that "[o]ur cases reveal no bright line, yet a car traveling more than fifty (50) miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there." *Jones,* 149 F.3d at 368. Again, border origination is the benchmark. Moreover, while the "fifty mile" rule may not be intended to create a bright line of demarcation, it comes close to doing so more often than not, because of how the Fifth Circuit has analyzed the cases. Accordingly, although the "fifty mile" rule was a salutary development in the face of the "vital element" rule, it tends to cause a rigidity of its own.

### C. The Uncertain Importance of the "Vital Element" and "Fifty Mile" Rules

In the past seven months, the Fifth Circuit has considered five roving patrol cases from the Western District of Texas. Four of these five are from the Pecos Division. *See Aldaco,* 168 F.3d 148 (Del Rio Division); *United States v. Villalobos,* 161 F.3d 285 (5th Cir.1998); *Moreno–Chaparro,* 157 F.3d 298; *Rodriguez–Rivas,* 151 F.3d 377; and *Jones,* 149 F.3d 364. The frequency and number of these appeals is not surprising, because the Pecos Division's docket, which is growing at an exponential rate, has a high percentage of roving patrol stops. For this Division, as well as for the Western District as a whole, it is consequently important to have a clearly-stated jurisprudence on roving patrol stops. In this Court's opinion, our Circuit is not there yet.

The most recent case, *Aldaco,* from the Del Rio Division of the Western District, was again written by Judge Reynaldo Garza. *See Aldaco,* 168 F.3d 148. It is thus not surprising that he continues to talk in terms of proximity to the border, a *Brignoni–Ponce* factor, as well as the "vital element" and "fifty mile" rules. *See id* at 150. "This Circuit has recognized that the proximity of a stop to the border is a paramount factor." *Id.* As mentioned before, other judges of the Fifth Circuit in other cases do not similarly integrate proximity to the border with either of the other two rules.

*Aldaco* also appears unique in that the distance of the stop from the border, seventy-five to eighty miles, is recorded but not, in the end, found to have any particular significance. *See id.* at 150. The opinion does concede that all remaining factors must be examined "carefully," instead of "charily" or *"most* carefully," *Compare Aldaco,* 168 F.3d 148, 150 (examining remaining factors carefully), *with Rodriguez–Rivas,* 151 F.3d at 380 (examining remaining factors *most* carefully) (emphasis added). That being said, Judge Garza examined the facts under the *Brignoni–Ponce* standard and concluded that the Border Patrol agents did have reasonable suspicion to make the stop. *See Aldaco,* 168 F.3d 148, 152. It is noteworthy to observe that, although the "vital element" and "fifty mile" factors were missing in the case, Judge Garza did not give undue weight to their absence and simply went forward with the *Brignoni–Ponce* analysis. *See id.* at 150–152.

Given the analysis and result in *Aldaco,* it is possible to interpret the decision as a subtle signal that the Fifth Circuit's view of the "vital element" rule is evolving once again. There is, for example, a difference between evaluating factors "carefully" as opposed to "most carefully" or "charily." Is it possible that, step by step, the Fifth Circuit is edging toward an analysis based on the totality of the circumstances, regardless of whether the vehicle originated at the border? Since Judge Reynaldo Garza has been the architect of past transitions, is it even more significant that he authored *Aldaco* ? Of the other four cases decided recently, *Villalobos* supports the possibility of a change while *Moreno–Chaparro, Rodriguez–Rivas* and *Jones* argue against it.

There is an important difference between *Villalobos* and *Aldaco.* In *Villalobos,* the Border Patrol agents first saw the Defendant's truck about thirty-six miles from the border. *See Villalobos,* 161 F.3d at 289. Thus, even though the stop took place more than fifty miles from the border, the initial citing was deemed to be significant. *See id.* Nowhere in the opinion, however, are the words "vital element" or "paramount factor" mentioned. Rather, the focus was almost entirely on the *Brignoni–Ponce* factors. *See id.* at 288–92. Again, reasonable suspicion was found to exist. *See id.* at 292.

*Villalobos* was written before *Aldaco* but after *Moreno–Chaparro, Rodriguez–Rivas* and *Jones.* While it seems to join with *Aldaco* to mark a change in the tenor and approach to roving patrol stops, neither case says so. *Moreno–Chaparro, Rodriguez–Rivas* and *Jones* take a much more traditional Fifth Circuit approach to the roving patrol analysis, indicating that the "vital element" rule is alive and well. For instance, in Moreno–Chaparro, the stop occurred sixty miles from the border and the "vital element" was missing. See *Moreno–Chaparro,* 157 F.3d at 299–300. The Fifth Circuit rejected the Border Patrol's reasons for suspecting that criminal activity was afoot, including the fact that the driver appeared surprised to see a Border Patrol agent at a temporarily closed checkpoint at a shift change. *See id.* at 299–301.

In *Rodriguez–Rivas,* the stop occurred more than fifty miles from the border, and the "vital element" was again missing. *See Rodriguez–Rivas,* 151 F.3d at 378, 380. The remaining *Brignoni–Ponce* factors were then examined "most carefully." *Id.* at 380. The Border Patrol agent based his

reasonable suspicion on several factors, including that the driver was "slouched low in his seat." *Id.* at 381. This fact was rejected as a basis for reasonable suspicion because the driver was only five feet, seven inches tall. *See id.* Also rejected by the Court as a basis for reasonable suspicion, over the objections in a dissent, was the fact that the vehicle had no rear license plate and no temporary tags. *See id.* at 381–383.

In *Jones,* the "vital element" factor was "totally missing from" the case. *Jones,* 149 F.3d at 368. The vehicle was stopped eighty miles from the border, too far "to support an inference that [the] journey originated at the border." *Id.* Unlike the view in *Moreno–Chaparro,* the *Jones* court found that traveling past a checkpoint at the time of a shift change "should be viewed as part of the totality of the circumstances ... that may add up to reasonable suspicion." *Id.* at 370. On the other hand, although the Supreme Court in *Brignoni–Ponce* viewed erratic driving as a factor to be considered in the reasonable suspicion analysis, the Court in *Jones* rejected the view because it "was far more likely" that the erratic driving in question was caused by the tailgating of the Border Patrol agent. *Compare Jones,* 149 F.3d at 370 *with Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. 2574. No reasonable suspicion was found. *See Jones,* 149 F.3d at 371.

While the opinions in *Moreno–Chaparro, Rodriguez–Rivas* and *Jones* seem to attach substantial importance to the "vital element" and "fifty mile" rules in the reasonable suspicion analysis, the opinions in *Aldaco* and *Villalobos* seem to give them much less emphasis. Where then do these recent cases leave our Fifth Circuit jurisprudence on roving patrols? For example, is a stop during a shift change a permissible factor to consider in the reasonable suspicion calculus? Must a trial court reject erratic driving as a factor because Border Patrol agents are likely to be tailgating and causing the problem? Has the "vital element" rule maintained its over-

riding viability? When the "vital element" and "fifty mile" rules are not met, must the trial court discount the enumerated *Brignoni–Ponce* factors, because they are to be viewed charily, or most carefully, or at least carefully? It appears that the answers to all these questions are often "yes" and sometimes "no."

The two cases now before the Court highlight the uncertainty that presently exists with the rules and the overall analysis. In addition, *Hernandez* shows how these two rules, if elevated above all other factors in their significance, can cause a result which is arguably contrary to the dictates of the Supreme Court, as set out in *Brignoni–Ponce.* Under the circumstances, this Court invites the Fifth Circuit to reexamine the entire concept. The rest of this Order is an argument for doing so.

### III. Reasonable Suspicion Factors in Rubio and Hernandez

#### A. The Facts

The Border Patrol stopped Rubio on Highway 118 at a point sixty-five miles from the nearest border crossing and thirteen miles south of the permanent checkpoint below Alpine. This permanent checkpoint was closed.

The Border Patrol stopped Hernandez on Highway 67 at a point fifty-five miles north of the border. At the time that the Border Patrol agents first observed *Hernandez,* they were parked at the permanent checkpoint station, which was not in operation at the time.

Without detailing any more of the particulars in the *Rubio* and *Hernandez* cases, the Court will outline the grounds for reasonable suspicion delineated by Magistrate Judge Platt in his recommendations.

1. The Border Patrol agent in *Rubio* had three and one half years of experience; one of the Border Patrol agents in *Hernandez* had six years experience and was a life-long resident of Marfa.

2. In *Rubio,* the stop occurred on a Sunday. In *Hernandez,* it occurred on a shift change.

3. The vehicle in *Rubio* had mud on its side and wheels. The vehicle in *Hernandez* was apparently clean.

4. In both instances, the agents concluded that the drivers did not look like tourists.

5. The agents did not recognize the cars or the drivers.

6. Both drivers were Hispanic.

7. Neither driver acknowledged the presence of the agents as they passed.

8. Both drivers swerved and looked into their rearview mirrors as the agents followed them.

9. There was a passenger in *Rubio*'s car who appeared to slouch down in his seat. *Hernandez*'s car was weighed down, as if heavily loaded.

Magistrate Judge Platt examined all of these factors, finding that the Border Patrol agents had reasonable suspicion to stop *Hernandez* but not *Rubio.* As the following analysis explains, this Court believes that it has no option but to adopt the Magistrate Judge's latter conclusion and to reject his former conclusion, based upon the current state of Fifth Circuit law. Despite *Aldaco* and *Villalobos,* this Court believes that the "vital element" and "fifty mile" rules are still controlling in the Circuit.

### B. Lack of Reasonable Suspicion Under Current Law

Since the Fifth Circuit law in roving patrol cases is based on *Brignoni–Ponce,* any analysis of reasonable suspicion factors in a roving patrol stop should begin with the factors enunciated in *Brignoni–Ponce:*

> Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant. They also may consider information about recent illegal border crossings in the area. The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion. Aspects of the vehicle itself may justify suspicion. For instance, officers say that certain station wagons, with large compartments for fold-down seats or spare tires, are frequently used for transporting concealed aliens. The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide. The Government also points out that trained officers can recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress and haircut. In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling.

*Brignoni–Ponce,* 422 U.S. at 884–85, 95 S.Ct. 2574 (citation omitted). In assessing the factors in *Rubio* and *Hernandez,* the Court will give attention to the *Brignoni–Ponce* factors as viewed by the Fifth Circuit.

1. *Characteristics of the area in which a vehicle is encountered.* The first factor listed in *Brignoni–Ponce* is the "characteristics of the area which [the officers making a stop] encounter a vehicle." *Brignoni–Ponce,* 422 U.S. at 884, 95 S.Ct. 2574. One such characteristic is an area's reputation as an alien or drug smuggling corridor. *See Aldaco,* 168 F.3d 148, 152 (finding that a "road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion.") *Nichols,* 142 F.3d at 870; *Inocencio,* 40 F.3d at 716. Highway 118 in *Rubio* and Highway 67 in *Hernandez* are known smuggling routes. Still, the "fifty mile" rule operates to make the Court view this factor charily, thus reducing its significance. Consequently, under the rule, little weight can be given to the reputations of both highways.

2. *Proximity to the Border.* The second factor listed in *Brignoni–Ponce* is the proximity of the suspected vehicle to the border. *See Brignoni–Ponce,* 422 U.S. at 884, 95 S.Ct. 2574. Logically, the closer one is to the border, the more likely it is that one will encounter smuggling activity. In the Fifth Circuit, however, proximity to the border comes very close to ending at fifty miles from the border. Therefore, in these cases now before the Court, proximity to the border again has little significance.

3. *Usual traffic patterns on the particular road.* The third enunciated factor in *Brignoni–Ponce* relates to the "usual patterns of traffic on the particular road." *Brignoni–Ponce,* 422 U.S. at 884–85, 95 S.Ct. 2574. One must assume that the Supreme Court in *Brignoni–Ponce* reasoned that Border Patrol agents should be able to tell, based on traffic patterns, if certain travel was indicative of smuggling activities. Fifth Circuit cases have found this to be a relevant and significant factor. *See Villalobos,* 161 F.3d at 289–90 (finding travel in lead car, load car arrangement, during time of day when traffic was extremely light supported reasonable suspicion); *Rodriguez–Rivas,* 151 F.3d at 380–81 (analyzing usual traffic patterns including lead car, load car scenario); *Pallares–Pallares,* 784 F.2d at 1232, 1234 (examining increased smuggling activities on holidays). Again, in its most recent case, the Fifth Circuit found this to be a factor. *See Aldaco,* 168 F.3d 148, 152 (finding the suspicion of the arresting officer was enhanced because of the rainy conditions on the evening of the stop). The agent in *Aldaco* reasoned that smugglers erroneously assumed that checkpoints would be closed and Border Patrol agents would be less active when inclement conditions existed. *See id.*

This factor creates a quandary in these cases before the Court. For example, the stop in *Hernandez* occurred on a shift change, but can such a factor be given weight in connection with a finding of rea-

sonable suspicion? As noted earlier, the Fifth Circuit has held that a stop during a shift change can be given some weight, although the factor alone will not support reasonable suspicion. *See Jones,* 149 F.3d at 370. On another occasion, however, the Fifth Circuit has rejected the significance of stops made during shift changes. *See Moreno–Chaparro,* 157 F.3d at 301 (finding shift change factor "non-remarkable and unsuspicious"). In light of the disagreement on the subject, and since this and all other factors must here be viewed charily because the stop in *Hernandez* was more than fifty miles from the border, this Court is reluctant to give the factor any weight.

Likewise, the fact that the stop in *Rubio* occurred on a Sunday when the checkpoint was closed cannot be given any significant weight, although this Court has heard testimony from Border Patrol agents that smugglers attempt to time their trips to coincide with checkpoint shutdowns. *See also, United States v. Henke,* 775 F.2d 641, 644 (5th Cir.1985) (describing common behavior of waiting for checkpoint to close before proceeding). None of the checkpoints on Highways 67, 118 and 385 can be opened on a twenty-four hour basis because of the lack of staff. Still, the issue is not open to consideration because it must be viewed charily.

4. *Previous experience with alien traffic.* The fourth factor listed in *Brignoni–Ponce* is related to the experience of the arresting officers. *See Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. 2574. The Fifth Circuit's most recent roving patrol case has held an officer's experience to be "a contributing factor in determining whether reasonable suspicion exists." *Aldaco,* 168 F.3d 148, 152 (describing agent's nearly 100% success rate). The agent in *Aldaco* had very impressive experience indeed. *See id.* The two cases before this Court do not detail such impressive experience. Without such delineation, since the stops occurred more than fifty miles from the

border, this factor, viewed charily, can be given little weight.

5. *Behavior of driver—avoidance of eye contact.* *Brignoni–Ponce* noted the behavior of the driver as a relevant factor. *See Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. 2574. In both of these cases, the drivers did not make eye contact or otherwise acknowledge the Border Patrol officers as they passed. The failure to make eye contact "cannot weigh in the balance in any way whatsoever." *Escamilla,* 560 F.2d at 1233; *see also, Nichols,* 142 F.3d at 868 ("Avoidance of eye contact is entitled to no weight"); *United States v. Pacheco,* 617 F.2d 84, 87 (5th Cir.1980) (no weight); *United States v. Lopez,* 564 F.2d 710, 712 (5th Cir.1977) ("[r]easonable suspicion should not turn on . . . ophthalmological reactions."). The Fifth Circuit reasoned that to allow this to be a factor "would put the officers in a classic 'heads I win, tails you lose' position. The driver, of course, can only lose." *Id* (quoting *Escamilla,* 560 F.2d at 1233); *but see, Aldaco,* 168 F.3d 148, 152 ("The avoidance of eye contact may or may not be entitled weight . . . it is simply one factor to consider."). Because the preponderant view is that eye contact cannot be considered as a factor, the Court will accord it no weight.

6. *Behavior of driver—erratic driving.* *Brignoni–Ponce* listed erratic driving as a factor that "can support a reasonable suspicion." *Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. 2574. Evidence in both cases established that the drivers swerved and looked into their rearview mirrors as the Border Patrol agents followed them. Whether this factor can be given weight depends to some extent on the actions of the Border Patrol agents.

> [T]he behavior of a driver may support a reasonable suspicion. *Brignoni–Ponce,* 422 U.S. at 884–885, 95 S.Ct. at 2582. (citing cases) Therefore, if the driver of a vehicle appears nervous at being followed or is so preoccupied by the presence of law enforcement as to allow his vehicle to drift off the road or across the

center line, his behavior may reinforce the law enforcement officer's suspicion. However, when the officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed. In this case, the fact that Jones continually glanced back at Agent Barrera in his rear-view mirror and subsequently drifted off the road-way does not give rise to reasonable suspicion. It was far more likely that Jones kept looking at Agent Barrera in his rear-view mirror because Agent Barrera was tailgating Jones, and Jones drifted off the pavement because he was looking in his rear-view mirror instead of where he was going. It should have occurred to Agent Barrera that Jones's behavior was the natural, innocent-man's response to being tailgated and no so much the apprehension of the guilty at being caught.

*Jones,* 149 F.3d at 370–71. Given the state of the record before the Court, it is difficult to ascertain whether the drivers were swerving and looking nervously into their rear-view mirrors as a natural response to being followed too closely. Under the circumstances, such factors can be given little weight here, especially since the Court must view them charily.

7. *Aspects of the vehicle.* *Rubio*'s vehicle had mud on it. *Hernandez*'s vehicle was apparently clean. *Jones* held that there is nothing suspicious about mud on a vehicle, even in the desert region of the West Texas border. *See Jones,* 149 F.3d at 368–69. Other cases, however, have held that mud on a vehicle can sometimes be suspicious. *See United States v. Muniz–Ortega,* 858 F.2d 258, 259–260 (5th Cir. 1988). Unusually clean vehicles can also be suspicious. *See Nichols,* 142 F.3d at 866. In light of the differing opinions on this factor and since the Court must view the factor charily, no weight will be accorded to the aspects of the vehicle in either case.

8. *Occupants did not appear to be tourists.* In both cases, the Border Patrol agents concluded that the drivers did not appear to be tourists. This factor supports reasonable suspicion. *See Aldaco,* at 151–52 (defendant not near Big Bend and did not appear to be a tourist); *Villalobos,* 161 F.3d at 289; *Rodriguez–Rivas,* 151 F.3d at 380 (examining fact that agent could recognize typical tourist); *Jones,* 149 F.3d at 369. However, it can be accorded little weight when viewed charily.

The tourist issue also depends to some extent on the road being traveled. Highways 118 and 385 are the main entrances to the Big Bend National Park. One would expect heavy tourist traffic on these roads; accordingly, a non-tourist on either 118 or 385 might, when evaluated with other factors, provide some reasonable suspicion justifying a stop. On the other hand, Highway 67 originates at Presidio and is more likely to have commercial and local traffic than tourist traffic. Differentiation between a tourist and a non-tourist on 67 would thus be more problematical.

9. *Driver not recognized.* The fact that the agents did not recognize either driver or car in either case can be a basis for reasonable suspicion, especially in *Hernandez,* since there the Border Patrol agent had lived in Marfa all his life and was thus very familiar with the region and its people. *See Villalobos,* 161 F.3d at 289; *Rodriguez–Rivas,* 151 F.3d at 380. Since these stops were made, however, more than fifty miles from the border, the factor, viewed charily, does not support reasonable suspicion.

10. *Hispanic Drivers.* "[T]he fact that one is of Mexican national origin does not create reasonable suspicion that one is an illegal alien, since, in border areas, there are far more legal citizens than illegal aliens of Mexican national origin. Something more must exist which indicates that one is in the country illegally." *Jones,* 149 F.3d at 369. That the drivers in these two cases were Hispanic cannot, by itself, be given any dispositive weight. This is in accord with the dictates of *Brignoni–Ponce. Brignoni–Ponce,* 422 U.S. at 885–86, 95 S.Ct. 2574. Viewed charily or otherwise, this factor is entitled to no weight.

11. *Weighted Down Car.* That *Hernandez* was driving a weighted down car can be given weight in support of a finding of reasonable suspicion if the vehicle is in the border area and suspected of carrying heavy contraband. *See United States v. Lopez–Gonzalez,* 916 F.2d 1011, 1015 (5th Cir.1990); *United States v. Garcia,* 732 F.2d 1221, 1225 (5th Cir.1984); *United States v. Sarduy,* 590 F.2d 1355, 1358 n. 4 (5th Cir.1979) ("We have consistently regarded the fact that a vehicle is heavily loaded as a factor justifying a stop."). This is, in fact, one of the factors approved by *Brignoni–Ponce. See Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. 2574. There are, however, several Fifth Circuit cases that have found that the factor is entitled to little or no weight. *See United States v. Melendez–Gonzalez,* 727 F.2d 407, 412 (5th Cir.1984) (not determinative); *United States v. Orona–Sanchez,* 648 F.2d 1039, 1042 (5th Cir. Unit A June 1981) (no weight); *Pacheco,* 617 F.2d at 86 (little weight). As the *Lopez–Gonzalez* court stated, however, *Sarduy* and *Brignoni–Ponce* are binding precedent. *See Lopez–Gonzalez,* 916 F.2d at 1015 (finding weight can be a factor if the vehicle is in the border area and suspected of carrying heavy contraband). Consequently, the Court finds that, although this factor can be given some weight in the reasonable suspicion analysis, caution is required.

12. *Hiding.* The passenger in *Rubio*'s car was slouched down, as if hiding. This factor can be can be given *some* weight in support of a finding of reasonable suspicion. *See Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. 2574 ("Officers may observe persons trying to hide"); *United States v. Salazar–Martinez,* 710 F.2d 1087, 1089 (5th Cir.1983) (passengers on floorboard); *Pacheco,* 617 F.2d at 86–87 (finding slouching relevant, but insufficient to justify a stop even when combined with other ob-

servations). In this case, however, the relevance of the suspect's behavior is diminished because the factor is considered charily.

13. *Conclusion.* Given the "vital element" and "fifty mile" rules and given the conflicts in Fifth Circuit opinions on how to treat certain *Brignoni–Ponce* factors (shift changes, erratic driving, muddy vehicle, and apparent weight of the vehicle), this Court will not validate the stops in either *Rubio* or *Hernandez.* Under the circumstances, it is simply not enough, for example, that the *Hernandez* stop happened on a known smuggling corridor in reasonable proximity to the border and involved a shift change, erratic driving, a weighted down vehicle and a Border Patrol agent who had spent his life in the area.

## IV. The Five Problems With The "Vital Element" and "Fifty Mile" Analysis

### A. Why

In this Court's opinion, there are at least five problems with the Fifth Circuit's "vital element" and "fifty mile" rules in connection with the analysis of roving patrol stops. Since the Court is uncertain that *Aldaco* and *Villalobos* mark a change in the analysis, it will assume that the traditional rules continue to apply.

The first problem with the rules is simply why? Why is it important for the Border Patrol agents to have a reasonable suspicion that the vehicle in question originated at the border? If the trip originated ten miles from the border, should the inquiry be any different? If every factor mentioned in *Brignoni–Ponce* were present in one case, but the vehicle itself began its trip fifty-five miles from the border, would that make any difference at all? Why indeed is border origination a vital factor under any circumstance? Based upon *Brignoni–Ponce*, we know that proximity to the border is important, but proximity and origination are simply not the same thing.

From the testimony that has been received in court in the Pecos Division over the years, it is clear that drugs and aliens are being routinely smuggled into the United States across the Division's 430–mile border. Without question, this smuggling originates at the border. The ways that the drugs and aliens are then transported north, however, are limited only by human imagination. They can be transferred in several vehicles over several roads. They can first be taken for a few days to one place, transferred later to another place, then picked up days after to be moved to a third location, awaiting further transportation. In most cases heard by this Court, the vehicle which is finally designated to make the trip north does not originate at or cross the border. To this Court, it is simply not clear why the analysis must focus on a vehicle's origination at the border. Why should this be the case?

### B. Inconsistent With and Contrary to the Supreme Court Test

The second problem with the two rules is that they are inconsistent with and in fact contrary to the "totality of the circumstances" test enunciated by the Supreme Court in *Brignoni–Ponce* and *Cortez.* Indeed, the requirement to view all other factors charily when the two rules are not met seems to fly directly in the face of the Supreme Court's mandate to look at "the whole picture." If all but two factors must be viewed "charily" or "most carefully," one simply cannot look at the whole picture, at least not in an even-handed way.

The *Hernandez* case illustrates this point. The Border Patrol stop occurred on Highway 67, which has been consistently described over the years in courtroom testimony as a known corridor for drug and alien smuggling. Ojinaga, on the Mexican side of the border across from Presidio, has also been described as a notorious staging area for drug traffic into the United States. Although this factor is not dispositive, it should be given some weight in the reasonable suspicion analy-

sis, especially when the Supreme Court wrote in *Brignoni–Ponce* that "[o]fficers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant." *Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. 2574.

In *Hernandez*, the stop occurred during a shift change. In suppression hearing after suppression hearing, this Court has heard testimony about the cat and mouse game that takes place in the border region between the Border Patrol and drug and alien smugglers. Again and again, the testimony has reiterated that people transporting drugs or aliens north on Highways 67, 118, or 385 pay attention to the time of day when shift changes occur. Shift changes must happen, and drug and alien smugglers make it their business to know when. The testimony makes sense because, after all, the business of drug and alien smuggling is big business and anything to reduce the risk of loss or capture is important. A stop during a shift change again is not dispositive, but should be given some weight.

In *Hernandez*, one of the Border Patrol agents involved in the stop had been on the job for six years and had lived in Marfa for his entire life. His view that the driver did not look like a tourist and appeared to be a stranger, while certainly not dispositive, should still be given some consideration, in light of the other factors.

Of more importance in *Hernandez* was the erratic driving and constant looking into the rearview mirror. This Court has heard testimony from agent after agent in case after case that this behavior is unusual and is often indicative that criminal activity is afoot. It deserves to be given some weight in the reasonable suspicion calculus but again would not alone be dispositive of the issue. Still, as a factor

mentioned in *Brignoni–Ponce*, 422 U.S. at 885, 95 S.Ct. 2574, it should not be disregarded by lower courts. Finally, the car in *Hernandez* appeared to be weighted down, certainly an important consideration and one mentioned in *Brignoni–Ponce*. *See Brignoni–Ponce*, 422 U.S. at 885, 95 S.Ct. 2574. In light of its significance to the Supreme Court, it should not be viewed charily.

If all of these factors in *Hernandez* could be taken into consideration, without the requirement that they must be viewed charily, this Court would conclude that the Border Patrol agents had reasonable suspicion to make the stop, based upon the totality of the circumstances, as first enunciated in *Brignoni–Ponce*. In actuality, however, under present Fifth Circuit analysis, such consideration is not permitted, not only because the facts in the case do not meet the "vital element" and "fifty mile" rules, but also because some, like travel during a shift change and erratic driving, get very uncertain treatment in the Fifth Circuit. Therefore, the suppression motion in *Hernandez* must be granted, despite the recommendation of the Magistrate Judge [1] and despite the Supreme Court's mandate to look at the whole picture. When some factors must be viewed charily, the whole picture simply cannot be given full consideration. Basically, at least to this Court, this means that factors unrelated to border origination must be discounted. This is true even though the Fifth Circuit has written that the factor of border origination alone is not controlling. *See Moreno–Chaparro*, 157 F.3d at 300. While it may not be controlling in theory, it often is dispositive in practice, at least as this Court reads the opinions.

## C. Almost Never the Case

When listing "any number of factors" to be taken into account in *Brignoni–Ponce*,

---

1. Under either the Supreme Court or Fifth Circuit analysis, the motion to suppress in

Rubio would be granted.

the Supreme Court made no mention at all that a vitally important factor in the reasonable suspicion analysis was whether the Border Patrol had reason to believe that the vehicle being stopped had crossed the border. *See Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. 2574. The closest it came was to mention that the agents "may consider information about recent illegal border crossings in the area." *Id.* at 885, 95 S.Ct. 2574. This is not the same thing, of course.

Moreover, in *Cortez*, the Supreme Court was examining facts where the vehicle being stopped had not crossed the border at all but had picked up aliens on a highway 30 miles from the border. *See Cortez*, 449 U.S. at 413–414, 101 S.Ct. 690. There was reason to believe that the aliens had crossed the border, but there was no reason to believe that the vehicle had done so. *See id.* at 414–415, 101 S.Ct. 690. The stop was approved. *See id.* at 421–422, 101 S.Ct. 690. Again, in *Cortez*, the Supreme Court said that reasonable suspicion will always be based upon an assessment of the whole picture. *See id.* at 417, 101 S.Ct. 690 ("The essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account.").

There is an obvious reason why the Supreme Court has never placed overriding emphasis on border origination. Quite simply, the Border Patrol seldom has reason to believe the vehicle in question has crossed the border. In reality, the only practical way a Border Patrol agent will have reason to believe that a vehicle traveling along Highways 67, 118 or 385 has recently crossed the border is if the crossing was picked up at the Presidio Port of Entry and can be confirmed by a computer search while the agent is following the vehicle in question. In light of the problems with communication and the short time period involved, this kind of confirmation is often simply not possible.

The fact that the vehicle has Mexican license plates likewise cannot be an indication that the vehicle recently crossed the border in order to satisfy the "vital element" rule because such vehicles are kept on the U.S. side of the border with frequency. Under the circumstances, in almost all Border Patrol stops in the Pecos Division of the Western District of Texas, the agents will not have reason to believe that the vehicle recently crossed the border. This then is the third problem with the Fifth Circuit's roving patrol analysis. Only in exceptional circumstances will "a vital element" be present in a roving patrol stop. Hence, the "fifty mile" rule comes into play.

## D. No Basis for the "Fifty Mile" Rule

"When the stop occurs a substantial distance from the border, we have found this [vital] element missing." *Melendez–Gonzalez*, 727 F.2d at 411. "Vehicles traveling more than fifty miles from the border are usually a 'substantial' distance from the border." *Inocencio*, 40 F.3d at 722 n. 7. Often, bright line rules are helpful, especially to trial judges who, for the most part, apply rather than interpret the law. Such rules should, however, have some basis in reality. At least in the Pecos Division of the Western District of Texas, the "fifty mile" rule has no basis in reality. It was an admittedly salutary development in the face of the "vital element" rule, but it still has no basis in reality.

Fifty miles of road is not much road in the Pecos Division, which encompasses ten of the eleven most western counties of Texas: Brewster, Culbertson, Hudspeth, Jeff Davis, Loving, Pecos, Presidio, Reeves, Ward and Winkler. These ten cover 30,450 square miles of land, almost twelve percent of the total land area of Texas, and include the three largest counties in Texas: Brewster, Pecos and Hudspeth.[2] Brewster County is larger than the state of Connecticut. The Pecos Divi-

---

**2.** The geographical and demographical information on the Pecos Division is found in the

*1998–1999 Texas Almanac* published by the *Dallas Morning News*.

sion shares 430 miles of international boundary along the Rio Grande with Mexico, representing one-fifth of the 2,000 mile U.S./Mexico border. There are only two authorized ports of entry on this stretch of border, one in Presidio, Texas, and one in Fort Hancock, Texas.

Much of the territory in the Pecos Division is rugged, remote and inhospitable. The region, if not desert, is certainly semi-arid and barren. The legendary Rio Grande is not much of a border, for it is not much of a river, and certainly not a grand one. See United States v. Jackson, 825 F.2d 853, 855–56 (5th Cir.1987). All of the Big Bend National Park is located in the Pecos Division. The eight highest peaks in Texas are in the Pecos Division and the county with the highest average elevation in Texas, Jeff Davis, is also in the Pecos Division.

There are not many people in the Pecos Division. The combined population of all ten counties is less than 79,000 people. One of these counties, Loving, is the least populated county in Texas, with ninety-six residents in 673 square miles. While the average population density in Texas exceeds seventy-two people per square mile, the average in the Pecos Division is less than three people per square mile.

To travel anywhere in the Pecos Division of the Western District of Texas, one must travel far and through a sparsely populated land. The three main highways that run north from the Mexican border are Highway 67 to Marfa, sixty miles from the border; Highway 118 to Alpine, ninety-seven miles from the border; and Highway 385 to Marathon, sixty-six miles from the border.[3] The Border Patrol maintains permanent checkpoints on all three highways; the one on Highway 67 is five miles

south of Marfa, the one on Highway 118 is fourteen miles south of Alpine and the one on Highway 385 is six and one-half miles south of Marathon.

In the Pecos Division, fifty miles from the border is not very far from the border, given the distances to travel to get anywhere in the Division. Depending on the road and location, one can be over 100 miles from the border in the Pecos Division and still not be considered a substantial distance from the border.

It is also important to note that, on Highways 67, 118 and 385, mile forty-nine from the border is no different than mile fifty-one in regard to traffic, terrain or population.[4] Thus, while it should not make a difference in the assessment of whether a Border Patrol agent had reasonable suspicion to stop a vehicle at mile forty-nine or mile fifty-one on Highways 67, 118 or 385, it in fact does in the Fifth Circuit.

Another anomaly caused by the "fifty mile" rule arises in the context of stops made at the permanent interior checkpoints as contrasted with stops made by roving patrols. It is well settled jurisprudence that the permanent interior checkpoints like those found on Highways 67, 118 and 385 are not the "functional equivalent" of the border. See United States v. Pierre, 958 F.2d 1304, 1308 (5th Cir.1992); United States v. Jackson, 825 F.2d 853, 854 (5th Cir.1987). Nevertheless, the Border Patrol may stop all vehicles briefly at these checkpoints to inquire as to citizenship. See United States v. Martinez–Fuerte, 428 U.S. 543, 566–67, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); United States v. Ortiz, 422 U.S. 891, 898–99, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) (Rehnquist, J., concurring). All three check-

---

3. See map attached as Exhibit A.

4. Tex. Dep't of Transp., Div. of Transp. Planning, *1997 El Paso District Highway Traffic Map (File D–10)*, attached as Exhibit B. The map shows, for example, that the average two-way daily traffic count on Highway 118 is the same at a point just north of Study Butte

as it is at a point just south of Alpine. In other words, the number of vehicles crossing a sensor on Highway 118 at a point twenty miles from the border is the same as the number crossing a point 65 miles from the border.

points on Highways 67, 118, and 385 are located more than fifty miles from the border, as mentioned *infra*. Therefore, the Border Patrol may stop vehicles for no reason at checkpoints more than fifty miles from the border, while the "vital element" and "fifty mile" rules weigh against roving patrol stops at points *south* of these same permanent checkpoints. In *Rubio*, the Border Patrol's decision to stop a vehicle thirteen miles south of the checkpoint comes into question in large part because it was made sixty-five miles north of the border. In *Hernandez*, the Border Patrol was parked at a checkpoint fifty-five miles north of the border. Yet, because they did not have the manpower to open the checkpoint and because they were more than fifty miles from the border, their suspicions must be considered charily. The Court recognizes the argument that permanent checkpoints present less of an intrusion into our rights. *See Martinez–Fuerte*, 428 U.S. at 559, 96 S.Ct. 3074; *Ortiz*, 422 U.S. at 894–95, 95 S.Ct. 2585 (finding checkpoint stops far less intrusive than roving patrol stops). Still, this anomaly caused by the "fifty mile" rule highlights the difficulty of the present analysis.

As a practical matter, therefore, the "fifty mile" rule hinders the analysis of roving patrol stops in the Pecos Division because it is artificial and does not take into account the vastness of the region. Accordingly, this is the fourth problem with the Fifth Circuit's roving patrol jurisprudence.

### E. A Foregone Conclusion

Whether well-founded or not, the "vital element" and "fifty mile" rules often sway the reasonable suspicion analysis in roving patrol cases in the Fifth Circuit. If the Border Patrol makes a stop within fifty miles of the border, it seems much more likely that the stop will be validated, in light of the substantial weight to be given to the "vital element" factor established in *Woodard*. If the stop is greater than fifty miles, its approval becomes much less likely, because all other factors must be viewed charily.

As a trial court looking at roving patrol cases in the Pecos Division, this Court finds that the often dispositive results of the two rules create special difficulties in close cases. Indeed, in a close case, where a suppression motion has been filed and where the stop originated outside the fifty mile range, this Court is certainly more prone to suppress the evidence, as the law now stands. Conversely, inside the fifty mile range, the suppression motion is more likely to be denied. As *Hernandez* illustrates, however, such a foregone conclusion is difficult to square with the dictates of *Brignoni–Ponce*.

In addition, the problem is exacerbated when the stop takes place forty-five to fifty-five miles from the border, where the "fifty mile" rule causes particularly irregular results, for both the government and defendants. There are, for example, cases within fifty miles of the border where evidentiary suppression would be appropriate but for the "fifty mile" rule. It is therefore respectfully submitted that *Brignoni–Ponce* does not contemplate an analysis that leads to the kind of result-oriented conclusion which now obtains in the Fifth Circuit. For this fifth reason, the Circuit's present rules on roving patrol stops merit re-examination.

### V. *A Proposal*

This Court has also reviewed the law of the other two Circuits on the Mexican border, the Ninth and the Tenth, regarding roving patrols. From that review, it appears that those Circuits have not found it necessary to engraft any special rules to the Supreme Court's roving patrol jurisprudence. This Court agrees. It cannot see any reason for doing so. A straightforward analysis based upon the totality of the circumstances would be easier to apply for trial courts, would comport with the reality of the border regions and would not skew the result. Under the circumstances, this Court proposes that the Fifth Circuit abrogate the "vital element" and "fifty mile" rules and return to the roving

patrol analysis originally set forth by the Supreme Court in the *Brignoni–Ponce* decision.

### VI. *Conclusion*

For the reasons stated, this Court will adopt the recommendation by United States Magistrate Judge L. Stuart Platt in the *Rubio* case and will grant the Defendant's Motion to Suppress. The recommendation in the *Hernandez* case will not be adopted. Rather, Defendant's Motion to Suppress will be granted as well.

It is accordingly ORDERED that the Motion to Suppress filed by Defendant Luis Arturo Rubio–Hernandez is hereby GRANTED. The evidence seized as a result of the stop by Border Patrol agents will be subject to the exclusionary rule.

It is accordingly ORDERED that the Motion to Suppress filed by Defendant Rigoberto Hernandez–Vizcaino is hereby GRANTED. The evidence seized as a result of the stop by Border Patrol agents will be subject to the exclusionary rule.

EXHIBIT

A

EXHIBIT

B

MAP MODIFIED FROM ITS
ORIGINAL FORMAT

*PROPOSED FINDINGS OF FACT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE*

THE MATTER BEFORE THE COURT is the Motion to Suppress filed by the Defendant, Luis Arturo Rubio–Hernandez. The Motion was referred to the undersigned U.S. Magistrate Judge for Report and Recommendation, and a hearing was conducted on December 3, 1998. After careful consideration of the Motion, evidence, arguments of counsel and the controlling law, it is the recommendation of the undersigned that the Defendant's Motion to Suppress be **GRANTED.**

## BACKGROUND

Border Patrol Agent Kevin McDole was assigned duty to conduct traffic checks on Highway 118, south of Alpine, Texas on August 30, 1998. Agent McDole stationed himself on the west side of Highway 118, observing north-bound traffic. He was parked 32 miles south of Alpine. This was 65 miles from the nearest border crossing. There is a permanent checkpoint on Highway 118, 13 miles north of his position and 19 miles south of Alpine. The checkpoint was not open.

Highway 118 runs north from the town of Study Butte to Alpine. Highway 118 is known as a common route for smugglers to transport illegal aliens, narcotics, or both. Highway 118 is also one of the two main roads that lead to the Big Bend National Park and is, therefore, frequented by many tourists. Study Butte is located at the entrance to Big Bend National Park, 13 miles from the United States/Mexico border. Two roads feed into Highway 118 at Study Butte: Highway 170 coming from Lajitas, a border town 13 miles southwest of Study Butte, and the Big Bend National Park entrance road. There are no roads intersecting Highway 118 between Study Butte and Alpine. There are no towns on Highway 118 between Study Butte and Alpine.

Agent McDole had three and one-half years experience as a Border Patrol Agent stationed in Alpine. He was parked in a marked Border Patrol unit that was visible to traffic as vehicles approached from the south.

At approximately 3:00 p.m. on Sunday, August 30, Agent McDole observed a Dodge (full size) sports utility vehicle coming from the south on Highway 118. As the vehicle got closer McDole saw that it was a blue Ram Charger. McDole noticed that there was a driver of Hispanic heritage in the vehicle. He also noticed that there was a passenger in the vehicle that appeared to be slouched down. The vehicle had mud on its side and wheels. McDole noticed that the car did not have taped to its front windshield a receipt sticker from the Big Bend National Park, which is customary for tourists driving North on Highway 118. McDole did not see any luggage in the car either. As the driver passed the agent, he did not stop, slow down, look at the Border Patrol unit, or even acknowledge the presence of Agent McDole.

Agent McDole pulled onto the highway to follow the vehicle. While trailing the vehicle, performing a vehicle and registration check, the driver crossed the center stripe of the road three times. The agent noticed that the driver continually looked into his rearview mirror to see the agent behind him. McDole ran a registration check on the vehicle and it came back registered to a Mr. Estrada of El Paso. Based on the totality of the circumstances presented to Agent McDole, he stopped the vehicle for an immigration check.

## ANALYSIS

### A. FOURTH AMENDMENT LAW AS IT APPLIES TO VEHICLE STOPS

The Fourth Amendment to the United States Constitution provides in pertinent part that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. . . .

The Fourth Amendment bars only *unreasonable* searches and seizures. *See United States v. Pierre*, 958 F.2d 1304, 1308 (5th Cir.1992); *United States v. Brignoni–Ponce*, 422 U.S. 873, 877, 95 S.Ct. 2574, 45 L.Ed.2d 607, 614 (1975) (holding that the Fourth Amendment applies to seizures that involve only a brief detention short of traditional arrest); *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). The reasonableness inquiry is driven by a balancing of " 'the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Pierre,* 958 F.2d at 1308–09 (citing *New York v. Class,* 475 U.S. 106, 118, 106 S.Ct. 960, 968, 89 L.Ed.2d 81 (1986)); *see also Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). However, the intrusiveness of the search is not measured so much by its scope as by whether it invades an expectation of privacy that society is prepared to recognize as "reasonable." *Pierre,* 958 F.2d at 1309 (citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)). The exclusionary rule, as it has developed under the Fourth Amendment, provides that evidence obtained in violation of an individual's Fourth Amendment rights may not be introduced against him at trial. *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963). For the most part, courts look askance at any searches conducted without a warrant. The Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions. *United States v. Cardenas,* 9 F.3d 1139, 1147 (5th Cir.1993) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). The exceptions include searches on the basis of probable cause or consent.

There is no question but that the stopping of an automobile by a police officer is a seizure within the meaning of the Fourth and Fourteenth Amendments. *Brower v. County of Inyo,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989); *Delaware v. Prouse,* 440 U.S. 648, 653, 661 99 S.Ct. 1391, 1396, 1400, 59 L.Ed.2d 660 (1979); *United States v. Shabazz,* 993 F.2d 431, 434 (5th Cir.1993); *United States v. Thomas,* 787 F.Supp. 663, 669 (E.D.Tex. 1992). A vehicle may lawfully be stopped (with one major exception, pertinent only in the border area, to be noted below) by a law enforcement officer only when there is probable cause to stop the vehicle or, lacking probable cause, when the officer has a

reasonable suspicion supported by articulable facts that criminal activity "may be afoot." *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1, 10 (1989); *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); *United States v. Breeland,* 53 F.3d 100, 102 (5th Cir .1995); *United States v. Tellez,* 11 F.3d 530, 532 (5th Cir.1993) (citing *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889). The latter type of stop is often referred to as an investigative or "Terry" stop. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *United States v. Cooper,* 43 F.3d 140, 145 (5th Cir.1995). According to *Terry,* even in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity. *United States v. Tapia,* 912 F.2d 1367, 1370 (11th Cir.1990). Such criminal activity includes traffic violations, however minor. *See Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (stop for expired license plate); *United States v. Kelley,* 981 F.2d 1464 (5th Cir.1993) (stop for seatbelt violation); *Breeland,* 53 F.3d at 102; *Thomas,* 12 F.3d at 1366; *United States v. Shabazz,* 993 F.2d 431, 434–35 (5th Cir.1993); *United States v. Bloomfield,* 40 F.3d 910, 915 (8th Cir.1994).

Probable cause means "a fair probability that contraband or evidence of a crime will be found," *Sokolow,* 490 U.S. at 7, 109 S.Ct. at 1585, 104 L.Ed.2d at 10; *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 544, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). If the officer is legally authorized to stop the driver, his actual intent or motivation does not invalidate the stop. *Bloomfield,* 40 F.3d at 915. Although *Terry* involved the seizure of an individual, its rationale has

been extended and consistently applied to vehicle stops. *See, e.g., United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 678, 83 L.Ed.2d 604 (1985); *United States v. Shabazz,* 993 F.2d 431, 435 (5th Cir.1993); *United States v. Kelley,* 981 F.2d 1464 (5th Cir.1993). Under *Terry,* the judicial inquiry into the reasonableness of the search or seizure "is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Shabazz,* 993 F.2d at 435 (citing *Terry,* 392 U.S. at 19, 88 S.Ct. at 1879).

Although a Border Patrol Agent is not legally permitted to stop a vehicle for a traffic violation, whether or not an individual commits a traffic violation can be one factor to consider as to whether there is a reasonable suspicion that the car's driver or its passengers are in the country illegally. *See United States v. Nichols,* 142 F.3d 857 (5th Cir.1998) (fact that vehicles tires swerved off road was a factor in the Court's finding that the agents had reasonable suspicion to stop the vehicle); *See United States v. Inocencio,* 40 F.3d 716 (5th Cir.1994) (car making illegal u-turns was a factor in the Court's finding that the agents had reasonable suspicion to stop the vehicle).

A stop of a vehicle when there is no probable cause to justify it can normally occur in one instance, and one instance only (outside of the border context); when there are articulable facts which give rise to a "reasonable suspicion" that the suspect has engaged in, or is about to engage in, criminal activity. The following, quoted from *United States v. Tapia,* 912 F.2d 1367, 1370 (11th Cir.1990), is the standard definition of "reasonable suspicion:"

> According to *Terry,* even in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal

activity. (citations omitted) In justifying such an intrusion, the "reasonableness" standard requires that a police officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879 (footnote omitted). In this regard, "reasonable suspicion" is determined from the totality of the circumstances, *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), and from the collective knowledge of the officers involved in the stop. *United States v. Williams,* 876 F.2d 1521, 1524 (11th Cir. 1989); *United States v. Cotton,* 721 F.2d 350, 352 (11th Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). Such a level of suspicion is obviously considerably less than proof of wrongdoing by a preponderance of the evidence, *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984), or even the implicit requirement of probable cause that a fair probability that evidence of a crime will be found. *Sokolow,* 109 S.Ct. at 1585. Nevertheless, "reasonable suspicion" must be more than an inchoate "hunch," and the Fourth Amendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop. *Id.; Williams,* 876 F.2d at 1524.

In *Sokolow,* the Supreme Court reiterated some factors which, although not in themselves proof of illicit conduct and possibly consistent with innocent travel, can, when taken together, give rise to a reasonable suspicion of criminal or drug activity. *Sokolow,* 490 U.S. at 10, 109 S.Ct. at 1587, 104 L.Ed.2d at 12. As early as 1983, in the case of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, the Supreme Court noted that "innocent behavior will frequently provide the basis for a showing of probable cause," and that "[i]n making a determination of probable cause the relevant inquiry is not whether partic-

ular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Gates,* 462 U.S. at 243–44 n. 13, 103 S.Ct. 2317. In *Sokolow,* the Supreme Court applied this same principle to the reasonable suspicion inquiry. *Sokolow,* 490 U.S. at 10, 109 S.Ct. at 1587, 104 L.Ed. 2d at 12.

## B. POWERS TO EFFECT VEHICLE STOPS WITHIN A REASONABLE DISTANCE OF THE BORDER

Border Patrol agents are permitted by statute to stop motorists within a reasonable distance of the border to check their authority for being in the United States. On its face, Title 8 U.S.C. § 1357 seems to give officers of the INS, including Border Patrol agents, complete discretion to stop vehicles without a warrant or probable cause within a reasonable distance of the border. Section 1357 reads, in part, as follows:

(a) Powers without warrant

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

. . . .

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States.

Federal regulations, 8 C.F.R. § 287, 1(2), interpret the term "reasonable distance" to mean a distance "within 100 air miles from any external boundary of the United States. . . ."

In *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court considered a question similar to the one currently before this court: may Border Patrol agents stop vehicles to check the citizenship status of the occupants? In that case, two Border Patrol agents were parked at an internal checkpoint, 5 miles south of San Clemente, California, observing passing traffic. The checkpoint had been closed due to inclement weather. It was nighttime, so the officers had their headlights directed at the oncoming vehicles. At some point they observed Brignoni–Ponce, a Mexican national who possessed a United States work permit, drive through. With him were two other individuals of Mexican descent. The agents decided to pull Brignoni–Ponce over to check his, and his passengers', citizenship status. As it turned out, both passengers were in the country illegally, and Brignoni–Ponce was charged with transporting illegal immigrants. At trial, he sought to suppress the testimony of and about the two passengers, claiming that this evidence was the fruit of an illegal seizure. *Id.* at 875, 95 S.Ct. at 2577, 45 L.Ed.2d at 613. The government contended that the above-quoted statutory provisions gave the agents the right to stop the defendant and question him and his passengers regarding their right to be in the United States. The government further claimed that at least in the areas adjacent to the Mexican border, a person's apparent Mexican ancestry alone justified belief that he or she was an alien and satisfied the requirements of 8 U.S.C. § 1357(a)(3).

The Supreme Court disagreed with both propositions. First, the Court reaffirmed its earlier decision in *Almeida–Sanchez v. United States,* which disapproved of the unlimited authority of roving patrols to make stops in border areas. *Almeida–Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Prior

to that decision, Border Patrol agents could stop vehicles at will, at areas near the border other than at checkpoints, and search them for contraband or illegal aliens. The Court held that "in the absence of probable cause or consent, [such] searches violate ... [the] Fourth Amendment right to be free of 'unreasonable searches and seizures.'" *Id.* at 273, 93 S.Ct. at 2539, 37 L.Ed.2d at 603. In *Brignoni–Ponce*, the Court held that "to approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers." *Id.* at 882, 95 S.Ct. at 2580, 45 L.Ed.2d at 617. *Almeida* introduced the concept of the "functional equivalent" of the border, at which the same type of search could be conducted as was permissible at the actual border. After *Almeida*, then, indiscriminate searches by roving patrols were no longer permitted. The second thing the Court did in *Brignoni–Ponce*, was weigh the interest of the government to protect the country's borders from the influx of illegal immigrants versus the interest of individuals to be free from undue government intrusion. What the court came up with was the exact same standard used to justify an investigatory stop when probable cause is missing. After weighing the two competing interests, the Court noted that

> ... because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in *Terry*, the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' (citation omitted). The

officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.

*Id.* at 881–82, 95 S.Ct. at 2580, 45 L.Ed.2d at 617. A requirement of reasonable suspicion for stops allows the government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference. *Id.* at 883, 95 S.Ct. at 2581, 45 L.Ed.2d at 617. The effect of the Court's decision was to limit exercise of the authority granted by both §§ 1357(a)(1) and (a)(3). Except at the actual border and its functional equivalents, officers on roving patrols may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country. *Id.* at 884, 95 S.Ct. at 2581, 45 L.Ed.2d at 618. The Court also shed some light on what may give rise to such a reasonable suspicion.

> Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area. Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant. (citations omitted) They also may consider information about recent illegal border crossings in the area. The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion. (citations omitted) Aspects of the vehicle itself may justify suspicion.... The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide.... In all situations, the officer is entitled to

assess the facts in light of his experience in detecting illegal entry and smuggling. (citing *Terry* ).

*Id.* at 884, 95 S.Ct. at 2581, 45 L.Ed.2d at 618–19.

One factor that the courts frequently focus on is whether an agent can reasonably conclude that a particular vehicle originated its journey at the border. *United States v. Melendez–Gonzalez,* 727 F.2d 407, 411 (5th Cir.1984). When the stop occurs a substantial distance from the border[1], this element is missing. *Id.* *Fixed* internal (non-border) *checkpoints* are typically located on routes of travel where the bulk of the traffic has the significant *potential* for international origin. This Court believes that a vehicle's travel from a point south of a fixed checkpoint is a general indication it had the significant potential for international origin. This Court does not view such circumstances as conclusive or even highly probative on the issue of border origin. It is simply one piece of evidence to consider in the evaluation of reasonable suspicion. Reasonable suspicion, however, is not limited to any one factor. *Melendez–Gonzalez,* 727 F.2d at 411; *United States v. Cardona,* 955 F.2d 976, 980 (5th Cir.1992). Instead, since reasonable suspicion is a fact intensive test, each case must be examined from the "totality of the circumstances known to the agent, and the agent's experience in evaluating such circumstances." *United States v. Casteneda,* 951 F.2d 44, 47 (5th Cir.1992). Furthermore, in *United States v. Cortez,* the Supreme Court clarified that the suspicion need not be confined to considerations of smuggling illegal aliens.

*United States v. Cortez,* 449 U.S. 411, 421–22, 101 S.Ct. 690, 696–97, 66 L.Ed.2d 621 (1981). "The question is whether, based upon the whole picture, they, as experienced Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity." *Id.*

Border Patrol agents are therefore governed by the same restraints as are other law enforcement officers. If agents would like to stop an individual to check citizenship status, or to investigate other matters, they must be able to articulate a legitimate reason for their suspicion that a federal law is being violated.[2] This threshold is lower than what is needed to establish probable cause, but is nevertheless more than a hunch.

## C. ANALYSIS OF "REASONABLE SUSPICION" FACTORS

The record demonstrates that the totality of the circumstances known to the Border Patrol agent at the time he stopped the vehicle in question were not sufficient to satisfy the reasonable suspicion standard. This Court is unable to conclude that the defendant's vehicle's journey originated at the border. Not only was the vehicle 65 miles from the nearest border crossing, but it was also traveling on one of the main routes for tourists from the Big Bend National Park. The Court recognizes that the mud on the vehicle may indicate that the vehicle possibly crossed the border at an unauthorized crossing of the Rio Grande River, however, there are numerous alternative explanations for the

---

1. Vehicles that are stopped more than fifty miles from the border are usually a substantial distance from the border. *See United States v. Cardona,* 955 F.2d 976, 980 (5th Cir.), *cert. denied,* 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 291 (1992) (stop of vehicle was proper where was between forty and fifty miles from the border), *United States v. Melendez–Gonzalez,* 727 F.2d 407–11 (5th Cir. 1984) (a stop sixty miles from the border was not sufficient to establish that the vehicle originated from border).

2. 8 U.S.C. § 1357(a)(5) is a statute amended in 1996 to provide authorization for Border Patrol Agents to have broader arrest authority when: 1) any federal offense is committed in the officer's presence; or, 2) for any federal offense if the agent has reasonable grounds to believe that the person is committing an offense.

mud on the vehicle.[3] The mud alone cannot support a reasonable conclusion that the vehicle's journey originated at the border.

### 1. Did vehicle's journey originate at the border?

A key factor usually considered when a vehicle is stopped by a roving patrol is whether the agent(s) had reason to believe that the vehicle originated its journey at the border. *United States v. Orona–Sanchez*, 648 F.2d 1039, 1042 (5th Cir.1981).[4] Based on the evidence presented at the suppression hearing, Agent McDole did not have reasonable grounds to believe that the vehicle in question had crossed the border. There was evidence presented that would tend to negate the likelihood that the car came from across the border based on current law in this Circuit. The car was 65 miles from the border.[5] It had Texas plates. There was no evidence presented by the government regarding the agent's belief surrounding the vehicle's origin. Additionally, the vehicle could have been (1) a tourist from Big Bend National Park, (2) from Terlingua, (3) from Lajitas, (4) from Redford, or (5) from Presidio. These facts indicate that McDole could not reasonably *assume* that the car originated its journey at the border in view of their testimony and current law in this Circuit.

These facts indicate that the agents could not necessarily reasonably *assume* that the car originated its journey at the border in view of their testimony and current law in this Circuit. Certainly there is more likelihood the vehicle had an international origin considering the location the vehicle was *first observed south of a fixed checkpoint* as compared to a location sixty miles further north on Interstates 10 or 20. However, an analysis of this factor does not tend to establish reasonable suspicion for the agents to have stopped the vehicle. It does provide a potential circumstance for the agents to use in firming up more concrete inferences. There is a distinction between concluding the vehicle had an international origin as contrasted to evidence a vehicle was traveling on a known smuggling route.

This factor of border origination alone, however, is not controlling. Other factors must be given appropriate consideration in the determination of whether reasonable suspicion existed. *United States v. Moreno–Chaparro*, 157 F.3d 298, 300 (5th Cir. 1998). Once it has been determined that there was no reasonable belief that the vehicle came from the border, the remaining factors supporting reasonable suspicion must be viewed "charity." *United States v. Henke*, 775 F.2d 641, 645 (5th Cir.1985);

3. At the suppression hearing the defense proposed several viable explanations for the mud such as: rain in the area had caused roads to be covered with the mud and certain creeks and crossings in the area perennially flowed with water that would cause the vehicle to be doused with mud if it were to cross them.

4. A number of recent decisions have considered this a vital element. *United States ·v. Moreno–Chaparro*, 157 F.3d 298, 300 (5th Cir. 1998); *United States v. Rodriguez–Rivas*, 151 F.3d 377, 380 (5th Cir.1998); *United States v. Jones*, 149 F.3d 364, 367 (5th Cir.1998); *United States v. Nichols*, 142 F.3d 857, 863 (5th Cir.1998); *United States v. Inocencio*, 40 F.3d 716, 722 (5th Cir .1994); *United States v. Chavez–Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993).

5. Courts have indicated that 50 miles is the benchmark for determining whether a car came from the border. *United States v. Car-*

*dona*, 955 F.2d 976, 980 (5th Cir.), *cert. denied*, 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 291 (1992); *United States v. Melendez–Gonzalez*, 727 F.2d 407–11 (5th Cir.1984). But, in the case at hand, the 50–mile benchmark seems arbitrary. There are no towns between Presidio and Marfa on Highway 67, nor are there any intersecting roads. The terrain is rugged and barren and it is not likely that vehicles traveling on Highway 67 would come from anywhere other than Presidio. Therefore, whether a vehicle on this highway is encountered 10 miles from the border or 60 miles from the border would not be of any practical importance in this type of analysis. This Court thinks the more relevant inquiry should be how many towns and intersecting roads there are between the border and the point where the vehicle is encountered. *Cardona* at 980

*United States v. Salazar–Martinez,* 710 F.2d 1087, 1088 (5th Cir.1983)

## 2. Characteristics of the area where the stop was made:

The first factor presented by the case at hand that tends to establish reasonable suspicion concerns the location at which the car was pulled over.[6] The highway where the car was stopped, Highway 118, is considered a common route for smugglers of illegal drugs and contraband. Border Patrol Agent McDole testified at the suppression hearing that Highway 118 was notorious as a popular smuggling route. Extending north from Study Butte to Alpine, Highway 118 encounters no other towns or connecting roads between Alpine and Study Butte. The highway is surrounded by a barren and rugged terrain. The Highway, however, is also one of the main routes traveled to visit Big Bend National Park. The defendant was also traveling on a Sunday, a day when it was likely that there were more tourists on the road. This factor does not weigh in favor of a finding of reasonable suspicion nor does it weigh against such a finding. It is effectively a neutral factor in this instance.

## 3. The driver and his car did not look like a tourist.

The second *Brignoni–Ponce,* factor encountered in this case that could establish reasonable suspicion relates to the appearance of the car.[7] People traveling north on Highway 118 are either from Big Bend National Park or surrounding communities (Study Butte, Terlingua, Redford and Presidio), or they are coming from the Mexican side of the border. McDole testified that the vehicle did not have a sticker on the front windshield, a sticker that Big Bend National Park requires them to put there in order to drive in the Park. Agent McDole said that he saw no luggage or equipment (such as tourists might have) visible either. It was established at the suppression hearing that the Park did not require such a sticker to remain on the car once it left the Park grounds. At the hearing, it was also brought to this Court's attention that *the sports utility vehicle in question could have had a good deal of luggage in the car and yet it would not have been visible to the agent because his patrol unit sat a considerable amount lower to the ground than did the Ram Charger.* Even the "rise" in the roadway where the agent was parked would not have provided him a good view of the interior of the Ram Charger. The factor articulated by the agent alone is not remarkable or very suspicious.

## 4. The driver was Hispanic.

The government urges the fact that the driver was Hispanic tends to give the agent reasonable suspicion that the driver was involved in illegal activity. The government reasons that most illegal immigrants in Texas are Hispanic and jumps to the conclusion that this makes it more likely that this driver was also an illegal immigrant, or was involved in the trafficking of aliens. This Court refuses to recognize the fact that the driver (the sole occupant of the car), was Hispanic as a weighty factor in this case. The Court in Brignoni–Ponce held the fact that a car's occupants are Hispanic, considered alone, does not furnish reasonable grounds to suspect that the occupants are illegal or that they are concealing illegal immigrants. *Brignoni–Ponce* at 886, 95 S.Ct. 2574. *Brignoni–Ponce* notes that agents can sometimes

---

6. The first factor listed in Brignoni–Ponce is: "known characteristics of a particular area." *Inocencio,* 40 F.3d at 722 (quoting *United States v. Casteneda,* 951 F.2d 44, 47 (5th Cir. 1992) (listing factors identified in *Brignoni–Ponce,* 422 U.S. at 884–85, 95 S.Ct. at 2581–82)).

7. Brignoni–Ponce lists the "appearance of the vehicle" as a relevant factor to consider. *Inocencio,* 40 F.3d at 722 (quoting *United States v. Casteneda,* 951 F.2d 44, 47 (5th Cir.1992) (listing factors identified in *Brignoni–Ponce,* 422 U.S. at 884–85, 95 S.Ct. at 2581–82)).

recognize the characteristic appearance of illegal immigrants, relying on such factors as the mode of dress and haircut. *Id.* That is simply not the case here. There is no evidence of dress or haircut in the record. The government, by offering this factor, establishing that McDole merely noticed that the driver was Hispanic, is trying to demonstrate a direct correlation between the driver being Hispanic and the likelihood that he is an illegal alien or is concealing illegal immigrants. This correlation is not adequate, especially given the percentage of Hispanic people that make up the population of this area. This factor in this case holds no significant weight.

### 5. Driver did not acknowledge presence of agents as he passed them.

The Fifth Circuit has routinely held that avoidance of eye contact is entitled to no weight. *Nichols* at 868; *United States v. Chavez–Villarreal,* 3 F.3d 124, 127 (5th Cir.1993); *Cardona* at 983 n. 9. An earlier Fifth Circuit case went further and held that the factor of eye contact "cannot weigh in the balance in any way whatsoever." *United States v. Escamilla,* 560 F.2d 1229, 1233 (5th Cir.1977). To hold otherwise "would put the officers in a classic 'heads I win, tails you lose' position. The driver, of course, can only lose." *Id.* Agent McDole testified that the driver "was rigid" and did not "acknowledge the presence" of the agent. This does not indicate suspicious activity and is, therefore, not a factor to consider in this case.[8]

### 6. Driver swerved and looked into rearview mirror nervously.

The fact that the driver crossed over the center stripe three times during the brief period that McDole followed the car, taken in conjunction with the fact that the driver "seemed preoccupied" by continually looking into the rearview mirror is another factor to consider.[9] This factor has been a significant consideration in previous Fifth Circuit cases: *Nichols* at 868 (car that stopped for abnormally long time at stop sign, traveled at an unusually slow speed and swerved off the road led to agent's reasonable suspicion); *Cardona* at 981 (vehicle slowed considerably and began weaving when followed bolstered reasonable suspicion); *Pallares* at 1234 (driver frequently observing the officers in the rearview mirror while being followed led to reasonable suspicion). In the light of these cases, we find this factor to be suspicious and bolsters a finding of reasonable suspicion.

## D. CONCLUSION

The Court concludes that, based on the totality of circumstances, there were not sufficient articulable facts to support the Border Patrol Agent's reasonable suspicion that Rubio–Hernandez was engaged in criminal activity. As such, this Court finds a violation of the Fourth Amendment. Because the stop of Rubio–Hernandez was done by the Border Patrol Officer without reasonable suspicion that the driver was engaged in some criminal activity, the search, conducted after the illegal stop, was therefore, not permissible under Fourth Amendment.

## RECOMMENDATION

For the reasons stated above, it is the recommendation of the undersigned United States Magistrate Judge that the Defendant's Motion to Suppress be **GRANTED.**

---

8. It would be a different matter if the eye contact were in addition to other actions by the driver that led the agents, judging their overall behavior, to believe there was something suspicious going on. *Nichols* at 868.

9. Brignoni–Ponce lists the "the behavior of the vehicle's driver" as a relevant factor to consider. *Inocencio,* 40 F.3d at 722 (quoting *United States v. Casteneda,* 951 F.2d 44, 47 (5th Cir.1992) (listing factors identified in *Brignoni–Ponce,* 422 U.S. at 884–85, 95 S.Ct. at 2581–82)).

## INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of this Proposed Findings of Fact and Recommendation on all parties by mailing a copy to each of them by Certified Mail, Return Receipt Requested. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within ten (10) days after being served with a copy unless the time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made; the District Court need not consider frivolous, conclusive or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions and recommendation contained in this report within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1428–29 (5th Cir.1996).