**UNITED STATES of America,
Plaintiff,**

v.

**Omar Arnold RODRIGUEZ, Defendant.**

**No. P–99–CR–258–F.**

United States District Court,
W.D. Texas,
Pecos Division.

Nov. 29, 1999.

---

Jeffrey Parras, Assistant United States Attorney, Pecos, TX, for United States.

Mimi Smith, Alpine, TX, for defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S PROPOSED FINDINGS OF FACT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

FURGESON, District Judge.

On this day, the Court considered the Magistrate Judge's Proposed Findings of Fact and Recommendation on Defendant's Motion to Suppress Evidence, filed November 15, 1999, which recommended denial of Defendant's Motion to Suppress Evidence, filed September 22, 1999, and Amended Motion to Suppress, filed October 7, 1999. The Magistrate Judge gave careful consideration to Defendant's Motion, evidence, supplemental briefs filed by both parties, and applicable law, and then recommended that Defendant's Motion to Suppress be denied. Neither party filed objections to the findings. Because the Court finds that the Magistrate Judge's findings and conclusions are neither clearly erroneous nor contrary to law, the Court agrees that Defendant's Motion to Suppress should be denied.

Accordingly,

It is ORDERED that the Magistrate Judge's Proposed Findings of Fact and Recommendation on Defendant's Motion to Suppress Evidence be ADOPTED IN ITS ENTIRETY.

It is furthermore ORDERED that Defendant's Motion to Suppress be DENIED.

## PROPOSED FINDINGS OF FACT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

PLATT, United States Magistrate Judge.

BEFORE THE COURT is the Defendant's Motion to Suppress, filed September 22, 1999. The Motion was referred to the undersigned United States Magistrate Judge for a Report and Recommendation, and a hearing was conducted on October 7, 1999. Because of the novel issues raised at the hearing, the Court took the Motion under advisement and allowed the parties additional time to file supplemental briefs. Both parties did timely file supplemental briefs.

After careful consideration of the Motion, evidence, arguments of counsel, and the controlling law, it is the recommenda-

tion of the undersigned that the Defendant' Motion to Suppress be **DENIED.**

## BACKGROUND

On July 25, 1999, at approximately 6:30 p.m., Border Patrol Agents Frank Lopez and Casey Smart were conducting roving patrols on Highway 385 south of Marathon, Texas. The Agents were in separate, marked Border Patrol vehicles. Agent Lopez has twelve (12) years experience with the Border Patrol in the Big Bend area. Highway 385 originates (or ends) inside the Big Bend National Park, which is a close distance to the Mexican border. Because of its close proximity to the border, Highway 385 is a favored route for illegal alien and drug smuggling. Agent Lopez testified that smugglers know the Border Patrol lack manpower to operate the fixed checkpoint station on Highway 385 for any extended amount of time; therefore, smuggling activities have increased on Highway 385 in order to avoid detection at the usually open checkpoint stations located on Highway 67 south of Marfa, Texas, and FM 118 south of Alpine, Texas. Agent Lopez also indicated that unless it is "tourist season," i.e., Spring Break, Highway 385 is not a heavily traveled highway. In fact, that portion of Highway 385 located south of Marathon and north of Big Bend is a remote area that consists mainly of ranches, and what traffic there is on Highway 385, in this area, is mainly that of local residents.

While on roving patrol, Agent Lopez testified that Border Patrol Agents look for suspicious activity. For example, older and newer model vehicles with single occupants that appear to be traveling together. According to Agent Lopez, this type of vehicle configuration is indicative of a "lead car-load car" scenario the Border Patrol encounters often. Under the "lead car-load car" scenario, drug smugglers will travel in tandem with a newer car (the "lead car") preceding the older car (the "load car"). The "lead car" scouts for law enforcement, and the "load car" carries the drugs. Agent Lopez indicated that smugglers use an older model vehicle as the

"load car" because they are aware that if caught, the vehicle will probably be forfeited and thus try to avoid losing a more expensive car to the government. Agents also look for things such as rental cars and vehicles that appear to be loaded down. These things too are indicative of smuggling activities.

The agents also look for signs that a vehicle might contain tourists. One sign agents look for to indicate tourism is a park permit that still may be attached to the upper left side of the front windshield (persons entering the park are usually required to pay a fee, and in return, they receive a permit to attach to their windshield; however, once a person leaves the park, common sense indicates that the person no longer is required to display the permit). Other signs they look for are camping equipment, biking equipment, or boating equipment.

There is a fixed checkpoint station located five (5) miles south of Marathon on Highway 385. The checkpoint was neither open nor was it scheduled to be open on the evening of July 25, 1999. Agent Lopez testified that this particular checkpoint does not have "normal" hours of operation. Instead, the checkpoint is open when the Border Patrol receives some type of intelligence information indicating the need to put the checkpoint into operation and if the necessary manpower is available. For example, Agent Lopez testified that the checkpoint may be operational for eight (8) hours one day, and it would likely be closed the next day so that a checkpoint station south of Alpine, Texas, may be opened. In other words, its operation was "sporadic." The shift supervisor—Agent Lopez's and Agent Smart's superior—makes the decision of whether to open and staff the Highway 385 checkpoint station. Both Agent Lopez and Agent Smart have worked the checkpoint station when it was operational. Both Agents were familiar with how the checkpoint was opened and operated, i.e., setting up a series of cones, flashing lights, and signs directing north-

bound traffic to stop briefly so as to allow agents to conduct brief inquires into the citizenship status of a vehicle's occupants.

Agent Lopez was conducting traffic observations on Highway 385 approximately eighty-five (85) miles north of the Mexican border and fifteen (15) miles south of Marathon. Agent Lopez was not sure of Agent Smart's exact location, but he was relatively close to the checkpoint south of Marathon. Again, the checkpoint was neither open nor was it scheduled to be open on the evening of July 25, 1999.

As Agent Lopez traveled south on Highway 385, he observed a newer model maroon Chevrolet pickup traveling north occupied by a sole Hispanic male. Agent Lopez continued to travel south. After traveling approximately one mile farther, he observed an older model white Buick Regal also occupied by a sole Hispanic male. Agent Lopez also observed a third vehicle following relatively close to the second vehicle. The third vehicle was a small, white Mitsubishi Eclipse occupied by two Anglo females in the front seat and three Hispanic females in the backseat.

Several things about this situation raised Agent Lopez's suspicion about the possibility of illegal activity. First, he did not observe a park permit in the windshield or any of the equipment described above that would indicate these vehicles contained tourists. Second, this appeared to be a typical "lead/load" scenario in that: the maroon pickup was a newer model vehicle, and the Buick was an older model vehicle; the vehicles were traveling within one mile of each other; both vehicles appeared to have sole Hispanic occupants; and because of his experience with the area, Agent Lopez knew smuggling activities had increased in the area in an attempt to avoid detection on the other two highways (67 and 118). Third, the Eclipse (the third vehicle) was close behind the Buick Regal, indicating it too could be traveling with the other two vehicles. Fourth, the occupants of the Eclipse were two Anglo females in the frontseat and three Hispanic females tightly situated in the backseat. And fifth,

Agent Lopez stated that although the predominate population in the area was Hispanic, the configuration and features of the occupants were not the type you see in that area, i.e., the Anglos in the frontseat and the Hispanics in the backseat, and the passengers in the back appeared to have a darker skin than Hispanics of the local population. Based upon this, Agent Lopez determined that he wanted to further investigate the vehicles.

Agent Lopez turned back north behind the three vehicles. Although he wanted to investigate the vehicles, he did not conduct a stop. Instead, because of his concern for safety, he radioed to Agent Smart, who was patrolling near the closed checkpoint, and asked him to open the checkpoint so that a check for illegal activity could be performed. Agent Lopez was approximately 10–12 miles south of the closed checkpoint when he contacted Agent Smart. Agent Smart opened the checkpoint, i.e., put out the cones, turned on the flashing lights, put out the signs, and awaited the vehicles arrival.

Agent Lopez followed the three vehicles toward the checkpoint. At this time, he did not attempt to stop the vehicles. When the driver of the maroon pickup was a quarter of a mile from the checkpoint, he pulled off to the shoulder of the highway. Agent Lopez testified that it would have been evident to anyone around at this point that the checkpoint was open. The driver of the maroon truck then made a U-turn and accelerated back south on Highway 385. In an attempt to stop the vehicle, Agent Lopez activated his emergency lights and pulled into the southbound lane. Agent Lopez motioned for the driver of the maroon pickup to pull over. When Agent Lopez realized the driver of the maroon pickup was not going to stop, Agent Lopez veered back into the northbound lane to avoid a collision. As the maroon truck passed by Agent Lopez, the driver waived. Agent Lopez did not pursue the maroon pickup; rather, he contin-

ued to follow the remaining two vehicles to the checkpoint.

When Agent Lopez focused his attention back to the two remaining vehicles, he noticed that the second vehicle (the Buick Regal) driven by the Defendant had pulled off to the shoulder of the road and stopped at a fairly close distance to the checkpoint. Agent Lopez thinks (and so does the Court) that the Defendant stopped because of Agent Lopez's emergency lights. After noticing that the Defendant had stopped his vehicle, Agent Lopez turned off his emergency lights and pulled up next to the Defendant's vehicle. Agent Lopez told the Defendant to drive into the checkpoint. The Defendant complied and drove into the checkpoint behind the Eclipse. The Eclipse, which was actually the third vehicle on the highway, never stopped and was the first vehicle into the checkpoint because the maroon pickup fled to the south and the Defendant had stopped on the side of the road.

Once inside the checkpoint, Agent Smart questioned the Defendant about his citizenship. The Defendant does not challenge that there was a strong smell of marijuana emanating from his car. Agent Smart received consent from the Defendant to search the car. After conducting a search the Agents recovered 139.54 lbs. of marijuana. In addition, the three Hispanic females in the Eclipse were illegal aliens, and the maroon truck was found abandoned several miles south of the checkpoint. A large quantity of marijuana was found near the pickup. Apparently the driver attempted to remove the load of marijuana, secret it, and then flee. For whatever reasons, the marijuana from the truck was not fully secreted.

## DISCUSSION

### 1. Issues

These are very unique facts, and they could raise a plethora of interesting issues; however, the Defendant has made specific challenges to evidence in his Motion to Suppress. He has narrowed the focus of those challenges in a subsequently filed Amended Motion, through his counsel's arguments at the Suppression Hearing, and in a Reply to the Government's Response to his Motion to Suppress. Therefore, the Court thinks that it is necessary to reiterate what it perceives to be the central focus of the Defendant's challenges.

The Defendant seeks to exclude the evidence obtained from his vehicle at the checkpoint. In addition, he seeks to exclude all statements made to various law enforcement personnel subsequent to the alleged illegal stop. The Defendant has not made a claim of standing or privacy interests in the search of the maroon pickup abandoned by its driver. The Defendant has not raised a "pretext" challenge to the individualized stop of the Defendant and co-defendants at a closed Border Patrol Checkpoint. Moreover, he concedes that the fact of his presence in Brewster County, on Highway 385 is not subject to exclusion. Therefore, the Court will not address in its findings and recommendation these challenges argued *sua sponte* by the Government in its Response. Except, the Court will address the Governments "pretext" argument as it relates to a *defacto* roving patrol stop as argued by the Defendant.

### 2. Roving Patrol Stop, Checkpoint Stop, or a *Defacto* Roving Stop?

At the outset, it is necessary to determine what kind of stop—roving or checkpoint—occurred in this case because the distinction is controlling for purposes of assessing the constitutionality of the stop. *See United States v. Martinez–Fuerte*, 428 U.S. 543, 545, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (holding that vehicles may be stopped at a fixed checkpoint for brief questioning of its occupants even though there is no reason to believe the particular vehicle contains illegal aliens); *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (holding that roving-patrol stops by the Border Patrol must be supported by reasonable suspicion). In short, if Border

Patrol agents initiate a roving stop, that stop must be based upon the type of reasonable suspicion defined in *Brignoni–Ponce.* On the other hand, if a stop occurs at a fixed checkpoint, which is validly in operation, agents may briefly question the occupants absent any suspicion.

The Defendant's contentions in this case are twofold. First, the Defendant argues that a "stop" occurred, for Fourth Amendment purposes, when Agent Lopez activated his emergency lights, and the Defendant pulled his vehicle to the side of the road and stopped; that this stop constituted a roving patrol stop; and that Agent Lopez lacked the requisite reasonable suspicion under *Brignoni–Ponce* to make the stop. Second, the Defendant argues that even if the Court finds that there was not a stop in the first instance, the stop that occurred at the checkpoint operated as a *defacto* roving patrol stop because the checkpoint was opened by Agent Smart specifically to stop the three vehicles, and thus it neither operated as a "fixed checkpoint," as defined by *Martinez–Fuerte,* nor did it comport with the safeguards identified in *Martinez–Fuerte* that justify vehicle stops absent reasonable suspicion. Therefore, the Defendant's argument is that a roving patrol analysis applies to the stop at the checkpoint, i.e., whether Agent Lopez had the necessary reasonable suspicion to conduct an investigative stop.

#### (a) Initial Stop

When Agent Lopez activated his emergency lights, and the Defendant stopped prior to reaching the checkpoint station, a Fourth Amendment seizure occurred. It is well-established that a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "[A] person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the

incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *see also California v. Hodari,* 499 U.S. 621, 627–28, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). "*Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari,* 499 U.S. at 628, 111 S.Ct. 1547.[1]

When the three vehicles first were observed by Agent Lopez, he was proceeding southbound on Highway 385, and they were traveling northbound. Agent Lopez turned back northbound and followed the three vehicles for approximately 10–12 miles toward the checkpoint station in a marked Border Patrol unit. When the maroon truck noticed the checkpoint open, it made a U-turn and headed back southbound. Agent Lopez activated his emergency lights to try and stop the maroon truck, but he was unsuccessful. While Agent Lopez's flashing lights were activated, the Defendant pulled to the side of the highway and stopped. Although subjectively Agent Lopez intended to stop the maroon vehicle when he activated his lights, a reasonable motorist in front of the marked Border Patrol unit, which had been following for 10–12 miles, could perceive this as an indication that Agent Lopez was ordering him to stop. When the maroon truck evaded Lopez, the Agent moved forward and directed the Defendant to the checkpoint.

Viewing all of the circumstances surrounding the Defendant's situation in an objective manner, the Court finds that a reasonable person would have believed that Agent Lopez's actions of activating his emergency lights, and thereafter directing the Defendant to move to the checkpoint

---

1. If there was any doubt the Agent had effectuated a stop, it was certainly confirmed when the Agent directed the Defendant to move to the "now opened" checkpoint.

was a show of authority indicating for the Defendant to stop. The Defendant complied with this show of authority; therefore, he was seized within the meaning of the Fourth Amendment. *See Malina v. Gonzales*, 994 F.2d 1121, 1126 (5th Cir. 1993) (finding that defendant's use of flashing red light to stop plaintiff on interstate was seizure by use of show of authority).

### (b) Checkpoint

Assuming arguendo that the initial stop was not considered a Fourth Amendment seizure, it is the Court's opinion that the subsequent stop made at the checkpoint constituted a *de facto* roving patrol stop, which the Agents needed reasonable suspicion to make. In *Martinez–Fuerte*, the Court approved the brief detention of vehicles at permanent checkpoints, even though there may be no reason to believe the particular vehicle contained illegal aliens, so that occupants could be questioned regarding their right to be in the United States. The Court explained that, although creating some inconvenience to the motoring public, this type of a brief detention did not impermissibly intrude on individual privacy interests. *Martinez–Fuerte*, 428 U.S. at 558–59, 96 S.Ct. 3074. The permanent nature of the checkpoint lessens the possibility that motorists will be taken by surprise, and agents at permanent checkpoints do not exercise the broad discretion found troubling in roving patrol stops. *Id.* at 559, 96 S.Ct. 3074; *Brignoni–Ponce*, 422 U.S. at 882–83, 95 S.Ct. 2574. "Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review." *Martinez–Fuerte*, 428 U.S. at 559, 96 S.Ct. 3074.

Agent Lopez testified that the checkpoint was not scheduled to be open on July 25, 1999. Moreover, the shift supervisor—Agent Lopez's and Agent Smart's superior—makes the decision of whether to open and staff the Highway 385 checkpoint station. But in this case, Agent Lopez himself made the decision to have the checkpoint station opened in order to stop all three vehicles. Agent Lopez made this decision because of his concerns about officer safety.

The Government acknowledges that Agent Lopez and Agent Smart made a discretionary decision to open the checkpoint on July 25, 1999; however, it contends that because "they did not choose the location of the checkpoint and the checkpoint's operation proceeded exactly as designed, that is, with brief questioning of motorists like Defendant concerning immigration status and illegal activity," the stop should be viewed as a valid checkpoint stop that requires no individualized suspicion of any kind to stop a vehicle. Hence, the Government argues, there is no need to view the Agent's subjective motivations in opening the checkpoint.

However, the Court agrees with the Defendant that under *Martinez–Fuerte* and its progeny, it is the absence of officer discretion that is crucial to the constitutional legitimacy of checkpoint stops. The Court finds that because Agent Lopez, and not the shift supervisor, made the decision to open the checkpoint, any stop made at the checkpoint should be viewed as a *de facto* roving patrol stop.

In summary, it is the Court's opinion that the initial stop by the Defendant constituted a roving patrol stop. However, even if the initial stop was not viewed as a roving patrol stop, this Court thinks that the subsequent stop at the checkpoint was a *de facto* roving patrol stop. In either case, Agent Lopez needed to possess the requisite *Brignoni–Ponce* reasonable suspicion to initiate a stop.

### 3. Reasonable Suspicion and Roving Patrols

In *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court articulated how roving patrols of the United States Border Patrol could constitutionally make stops of vehicles traveling near the United States border. Reasoning from *Terry v. Ohio*, the Court stated "that in appropriate circumstances the Fourth Amendment allows a

properly limited search or seizure on facts that do not constitute probable cause to arrest or to search for contraband or evidence of a crime." *Id.* at 881, 95 S.Ct. 2574 (relying on *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Similar, in roving patrol cases at the border,

> because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion.

*Id.*

In *Brignoni–Ponce*, the Court further held that, except "at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. 2574. This test was extended to include criminal activity as well as alien smuggling in *United States v. Cortez*, where the Court held that "the question is whether, based upon the whole picture, they, as experienced Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 421–22, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In *Cortez*, the Court explained how the test was to be administered:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. *But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be*

*taken into account.* Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*Id.* at 417–18, 101 S.Ct. 690 (emphasis added). In *Brignoni–Ponce* the Court enunciated a number of factors to consider in determining whether reasonable suspicion existed to stop a vehicle in the border area: (1) proximity of the area to the border; (2) known characteristics of a particular area; (3) previous experience of the arresting agents with criminal activity; (4) usual traffic patterns of that road; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6) the behavior of the vehicle's driver; (7) the appearance of the vehicle; (8) the number, appearance and behavior of the passengers. *Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. 2574; *see also United States v. Aldaco*, 168 F.3d 148, 150 (5th Cir.1999).

In the Fifth Circuit, the *Brignoni–Ponce* factors are evaluated for reasonableness in light of two additional rules: (1) a "vital element" of the *Brignoni–Ponce* test is whether the agents making the stop have reasons to believe that the vehicles came from the border, *see United States v. Pallares–Pallares*, 784 F.2d 1231, 1233 (5th Cir.1986), and (2) when the stop occurs a substantial distance from the border, defined as over fifty miles, this "vital element" is missing. *See United States v. Inocencio*, 40 F.3d 716, 722 & nn. 6–7 (5th Cir.1994). If there is no reason to believe that the vehicle has come from the border, i.e. if the "vital element" rule has not been met, all other factors must be examined "charily." *See United States v. Pena–Cantu*, 639 F.2d 1228, 1229 (5th Cir. Unit A Mar.1981); *Pallares–Pallares*, 784 F.2d at 1233. However, if the vehicle is first observed within fifty miles of the border the "vital element" of border origination can be presumed, and the *Brignoni–Ponce* factors need not be viewed "charily." *See United States v. Rubio–Hernandez*, 39 F.Supp.2d 808, 813 (W.D.Tex.1999) (mem.).

#### 4. Application of the *Brignoni–Ponce* Factors

■ Because so many of these factors are interrelated, the Court will address the factors together as they relate to the case at bar. In addition, the Court will attempt to do this in a type of chronological order.

There is no question that the initial observation of the Defendant by Agent Lopez occurred beyond fifty (50) miles of the Mexican border. Thus, the "vital element" rule has not been met. It does not follow, however, that simply because the "vital element" rule has not been met, that an agent's roving patrol stop is *per se* unreasonable. *See United States v. Morales,* 191 F.3d 602 (5th Cir.1999) (finding reasonable suspicion even though stop occurred 150 miles from border); *United States v. Orozco,* 191 F.3d 578 (5th Cir. 1999) (finding reasonable suspicion even though stop occurred 200 miles from border); *United States v. Gonzalez,* 190 F.3d 668 (5th Cir.1999) (finding reasonable suspicion even though stop occurred 62 miles from border). Rather, the Court will view the remaining factors "charily."

An area's reputation as an alien or drug smuggling pipeline is a characteristic weighed to determine the reasonableness of the agent's suspicion. *See Aldaco,* 168 F.3d at 152; *Inocencio,* 40 F.3d at 716. Highway 385 consummates inside the Big Bend National Park, which is adjacent to the Mexican border. According to Agent Lopez, who has twelve (12) years experience with the Border Patrol in the Big Bend area, because of its close proximity to the border, Highway 385 is a favored route for illegal alien and drug smuggling. Agent Lopez testified that smugglers know the Border Patrol lacks manpower to operate the fixed checkpoint station on Highway 385 for any extended amount of time; therefore, smuggling activities have increased on Highway 385 in order to avoid detection at the usually open checkpoint stations located on Highway 67 south of Marfa, Texas, and FM 118 south of Alpine, Texas. However, the "fifty mile" rule only allows the Court to view this factor charily.

*See Rubio–Hernandez,* 39 F.Supp.2d at 816. Thus, little weight can be given to the reputation of the area.

The usual traffic patterns of Highway 385 is also an important consideration in determining reasonable suspicion. *See United States v. Samaguey,* 180 F.3d 195, 198 (5th Cir.1999). This includes apparent "lead car/load car" arrangements. *See United States v. Villalobos,* 161 F.3d 285, 289–90 (5th Cir.1998) (finding travel in lead car, load car arrangement, during time of day when traffic was extremely light supported reasonable suspicion). As Agent Lopez traveled south on Highway 385, he observed a newer model maroon Chevrolet pickup traveling north occupied by a sole Hispanic male. Agent Lopez continued to travel south. After traveling approximately one mile farther, he observed an older model white Buick Regal also occupied by a sole Hispanic male. Agent Lopez also observed a third vehicle following relatively close to the second vehicle. The third vehicle was a small white Mitsubishi Eclipse occupied by two Anglo females in the front seat and three Hispanic females in the backseat.

The manner in which the vehicles were traveling (all within a relatively close proximity to each other) indicated to Agent Lopez a typical "lead/load" scenario. Moreover, Agent Lopez did not see any indicia associated with the vehicles to indicate they were tourists—a factor used in weighing reasonableness. *See Aldaco,* 168 F.3d at 151–52; *Villalobos,* 161 F.3d at 289. Furthermore, Agent Lopez testified that the configuration of the occupants in the Eclipse (two Anglo females in the front seat and three Hispanic females tightly situated in the backseat) coupled with the fact that the three Hispanic females appeared to be of a darker skin color than Hispanics of the local population led him to suspect the possibility of alien trafficking. *See Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. 2574 (recognizing that trained officers can recognize the characteristic appearance of persons who live in Mexico,

relying on such factors as the mode of dress and haircut). However, because the observations occurred beyond fifty miles from the Mexican border the Court must view them "charily" and afford them little weight.

At this point, Agent Lopez, based upon his experience and his observations, concluded that he wanted to investigate all three vehicles further. Agent Lopez did not initiate a stop, however. Instead, he radioed Agent Smart to open the checkpoint station, so the Agents could conduct an investigatory stop. It is the Court's opinion that had Agent Lopez initiated a stop at this point, 10–12 miles south of the checkpoint station, it could not be supported by reasonable suspicion. Moreover, if all three vehicles had simply proceeded into the checkpoint station and were stopped, the Court would have viewed this as an unreasonable *de facto* roving patrol stop because the factors articulated by Agent Lopez did not amount to reasonable suspicion.

Here, however, the maroon pickup, after obviously realizing the checkpoint station was open, stopped on the shoulder of the road a quarter of a mile from the checkpoint. It then made a U-turn and accelerated back southbound in the direction it had come. The Court thinks that this factor, even viewed "charily," along with the observations previously articulated by Agent Lopez created a reasonable suspicion that the three vehicles were engaged in illegal activity, thereby justifying an investigatory stop of the vehicles. *See United States v. Ramirez–Lujan,* 976 F.2d 930, 933 (5th Cir.1992) (indicating that "temporary stops without reasonable suspicion are permitted in U-turn type situations where people are seen making U-turns that avoid their passing through visible border patrol checkpoints" because "they appear to be inferentially grounded on the assumption that a u-turn type maneuver within sight of the checkpoint being approached gives rise to the reasonable suspicion that it is taken to avoid going through the checkpoint"); *see also United States v. Macias,* 546 F.2d 58 (5th Cir.

1977) (finding reasonable suspicion when considering other circumstances with the fact that defendants drove to within 350 yards of a checkpoint and then executed a U-turn, driving away at high speed).

**Conclusion**

The Court concludes that even though Agent Lopez encountered the Defendant's vehicle beyond fifty miles (50) from the Mexican border, he articulated facts sufficient to support his reasonable suspicion that the Defendant was engaged in criminal activity by the time the stop was actually effectuated. As such, this Court finds no violation of the Fourth Amendment.

**RECOMMENDATION**

For the reasons stated above, it is the recommendation of the undersigned United States Magistrate Judge that the Defendant's Motion to Suppress be **DENIED.**

**INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a copy of this Proposed Findings of Fact and Recommendation on all parties by mailing a copy to each of them by Regular Mail. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within ten (10) days after being served with a copy unless the time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made; the District Court need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendation contained in this report shall bar the party from a *de novo* determination by the District Court. Additionally, a party's failure

to file written objections to the proposed findings, conclusions, and recommendation contained in this report within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Serv. Auto. Ass'n,* 79 F.3d 1415, 1428–29 (5th Cir.1996).